UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

GROVE CITY VETERINARY                          No. 3:13-cv-02276-AC
SERVICE, LLC, HEATHER M. FEES,
DVM, HEATHER FEES, DVM, LLC,           FINDINGS & RECOMMENDATION
THOMAS L. BALTZELL, POLARIS
VETERINARY SERVICE, LLC,

                        Plaintiff,

            v.

CHARTER PRACTICES
INTERNATIONAL, LLC,

                        Defendant,
_____

Judge ACOSTA, Magistrate Judge:

        Plaintiffs Grove City Veterinary Service, LLC, Heather M. Fees, DVM ("Fees"), Heather

Fees, DVM, LLC, Thomas L. Baltzell, DVM ("Baltzell"), and Polaris Veterinary Service, LLC

(collectively "Plaintiffs") filed this lawsuit against Defendant Charter Practices International,

LLC ("CPI") on December 20, 2013.  Plaintiffs complaint alleges eight claims including: (1)

FINDINGS & RECOMMENDATION - 1                                              [RMD]

breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) hostile

work environment under Title VII and Oregon law; (4) retaliation under Title VII and Oregon

law; (5) negligent retention and supervision; and (6) intentional infliction of emotional distress

("IIED").  CPI answered Plaintiffs' Second Amended Complaint and alleged counterclaims for

attorney fees.  (Dkt. No. 70.)  CPI now moves for summary judgment on each of Plaintiffs'

claims and asks for an award of attorney fees.

*Factual Background*

Fees and Baltzell are veterinarians who operate pet hospitals in and around Columbus, Ohio.

Fees is the sole member of Plaintiffs Grove City Veterinary Service, LLC ("Grove City") and

Heather Fees, DVM, LLC.  Together, Fees and Baltzell are joint members of Plaintiff Polaris

Veterinary Service, LLC ("Polaris"). (Patel Decl. Exs. F, J, K.)  Grove City, Polaris, and Heather

Fees, DVM, LLC (collectively, the "LLC Plaintiffs") own and operate veterinary hospital franchises

pursuant to a Charter Practice Agreement with CPI.  (*Id*.)  Defendant CPI owns and operates

veterinary hospitals ("practice hospitals") under the trade name "Banfield Pet Hospitals"

("Banfield").  CPI also licenses the use of Banfield's name and business model to licensees to open

non-CPI owned hospitals ("charter hospitals") in an arrangement that resembles a commercial

franchise.  (*Id*.)

I.  The History of the Business Relationship Between Plaintiffs and CPI

Fees has operated CPI charter hospitals since 2000.  Baltzell joined her at Polaris in 2005.

In 2008 and 2011, Fees and Baltzell entered into "charter practice agreements" with CPI which

articulated the terms of the business relationship between the parties (the "Old Charter

Agreements"). (Patel Decl. Ex. B.)  Although the Old Charter Agreements were not set to expire

until 2018, CPI offered in late 2012 to terminate the Old Charter Agreements and enter into new contracts which eliminated a new benefits program for charter practice owners which was included in the Old Charter Agreements.  (Patel Decl. Exs. C, E, G; Ex. H at 6-7.)  Before the parties executed the proposed new charter agreement, they executed "release agreements" (the "Releases") which terminated the Old Charter Agreements and released CPI "from any claims, debts, liabilities, demands, obligations, actions, and causes of action, known or unknown, vested or contingent . . . that Doctor or Company may now have or may ever had relating to the [Old Charter Agreement], the Related Agreements, or the Hospital[s]."  (Declaration of Caroline Harris Crowne in Support of Defendant's Motion for Summary Judgment ("CHC Decl.") Exs. 2-4.)  Thereafter, CPI and the Plaintiffs signed the new charter agreements (the "New Charter Agreement" or "Charter Agreement"[1]), which became effective January 1, 2013.  (CHC Decl. Ex. 1 at 1.)

The sixty-four page Charter Agreement sets out the terms of the parties' relationship including strict rules about how Plaintiffs can advertise and use CPI's trademarks, what computer system Plaintiffs must use, how many hours per week the Plaintiff's hospitals must be operational, and more.  (CHC Decl. Ex. 1.)  Section 7.1 of the Charter Agreement dictates how Plaintiffs are required to run the hospitals on a day-to-day basis.  (*Id*. at 24.)  Among those mandates is the requirement Plaintiffs adhere to the "distinctive business method," which CPI refers to as "the System."  (*Id*. at 9.)  Further, under the Charter Agreement, Plaintiffs are required to comply with the "integrated hospital management system for medical treatment protocols, scheduling, billing, and client and administrative records, known as PetWare."  (*Id*. at 9.)  Section 7.1 of the Charter

---

[1]Although Plaintiffs entered into three separate charter agreements with CPI, one for each pet hospital, the court will refer to the nearly identical charter agreements as the "Charter Agreement" or "New Charter Agreement" for simplicity.

Agreement provides, in relevant part:

7.1 <u>Compliance with System</u>

You must operate the Hospital in accordance with the System, except that, You may deviate from the System in the specific instances (if any) in which You, or the licensed veterinarians operating the Hospital, reasonably determine, in Your or their professional judgment, that the System would not satisfy the statutory, regulatory, or professional ethical obligations. In such instances, You or they may deviate from the System only to the extent You or they reasonably deem necessary to satisfy the applicable statutory, regulatory, or professional ethical obligations. Otherwise, You must comply with the System as expressed in PetWare, the Operating Manual, and otherwise in writing by CPI, and You must meet or exceed CPI's minimum quality standards. You acknowledge that such standards may be higher than the standards for veterinary practices generally prevailing in the community in which the Hospital is located. PetWare and the Operating Manual contain, among other things, medical protocols, specifications, standards, operating procedures, accounting and bookkeeping methods, computer and information technology policies and procedures, marketing ideas, equipment requirements, inventory requirements and control techniques, plans and specifications, fixture and decor requirements, public relations requirements and other rules and guidelines that CPI may prescribe from time to time. If You wish to deviate from the System as expressed in the Operating Manual or otherwise in writing by CPI, and such deviation is not related or ancillary to medical protocols or the practice of veterinary medicine, You must apply for a formal variance and receive CPI's prior written consent.

(*Id*. at 24.)

The Charter Agreement also defines CPI's duty to train Plaintiffs' employees. (*Id*. at 18-20.) For example, CPI agrees to provide initial mandatory training course, training at periodic conferences and symposia, as well as periodic supplemental training to charter hospital employees. (*Id*. at 18.) Section 4 also provides:

4.5 <u>Training Requested by You</u>

Upon not less than 30 days' prior written notice to CPI, You may request additional training at CPI's training center or at other agreed upon locations. The duration and cost of training is negotiable depending upon Your needs and is subject to available training space and staff.

(*Id*. at 19.)

Like other parts of the Charter Agreement, the financial arrangement between Plaintiffs and CPI resembled a franchise agreement.  In return for their right to use CPI's trademarks and "System," Plaintiffs paid CPI an "initial fee" of $65,000. (*Id*. at 14.)  Plaintiffs were then required to pay a royalty fee and service fee for each month of operation.  (*Id*. at 14-15.)  The Charter Agreement provided Plaintiffs did not need to pay a royalty for the first fiscal year of operation. (*Id*.)  However, in the second fiscal year, they were required to pay 2.5% of their net monthly revenue, and the royalty increased to 4%, 5.5%, and 6% in the third, fourth, and fifth fiscal years respectively.  (*Id*.)  For each year after the fifth fiscal year, the royalty fee remained 6%.  (*Id*.)  The Plaintiffs were not required to pay a service fee for the first ninety days of operation, but thereafter were required to pay 9% of their net monthly revenue.  (*Id*.)

CPI agreed under the Charter Agreement to perform all accounting and payroll duties.  (*Id*. at 16-17.)  CPI set up a "hospital depository account" into which Plaintiffs deposited their gross earnings.  (*Id*.)  At the end of each month, Plaintiffs were required to send an accounting of all receipts and disbursements to CPI, who would perform an accounting, withhold their service fee and royalty fee, remit necessary taxes, disburse payroll according to Plaintiffs' desires, and return any remaining profits to the hospital depository account.  (*Id.* at 16-17.)

Although the Charter Agreement required Plaintiffs to submit their employees to background checks, Fees and Baltzell were free to make hiring and firing decisions, and were free to determine the scope of their own role in operating the hospitals.  (*Id*. at 27.)  In the early years of her practice, Fees worked as one of the primary veterinarians in her practices, but eventually hired others to perform veterinary services while she oversaw the "leadership and management" aspects of the

hospitals. (CHC Decl. Ex. 5 at 32-33.) Regardless of her role in operating the LLC Plaintiffs, Fees repeatedly affirmed, both in written agreements and in deposition testimony, that she was not a CPI employee but was employed by the LLC Plaintiffs. (CHC Decl Ex. 13, 14, 15, 18; Ex. 12 at 3.) Baltzell also signed several documents titled "ACKNOWLEDGMENT BY CHARTER PRACTICE EMPLOYEE" stating he was not a CPI employee. (CHC Decl. Exs. 16, 17, 19, 20.)

## II.  Provision of Support Services and Retaliation

To ensure continuity of service between CPI-owned practice hospitals and the charter hospitals, CPI developed the concept of "One Banfield." (Patel Decl. Ex. R at 5.) Under "One Banfield," which CPI promoted in power-point presentations at the annual conferences, CPI promised charter hospitals the "same expectations," "same opportunities," and "same resources" as CPI-owned practice hospitals. (*Id*. at 11; Ex. A at 15-16.) To facilitate the One Banfield concept and continuity of service between hospitals, CPI provided its hospitals with administrative support in the form of a field director, medical director, marketing team, wellness plan, retention team, and finance team. (Patel Decl. Ex. P at 5-7.) Of particular importance are the field director and medical director positions. The field director is responsible for facilitating profitability and assisting charter practices to provide a quality client experience. (Patel Decl. Ex. T at 18.) Medical directors "provide and support the medical protocols in [both charter and practice] hospitals" and provide case-specific medical support to hospital veterinarians. (*Id*. at 19.)

Since Fees first entered into the 2013 Charter Agreement, Fees believed CPI was not providing training and support services as required by the Charter Agreement. (Patel Decl. Ex. H at 14.) Specifically, she believed CPI was not providing medical director and field director support to her hospitals. (*Id*.) Fees filed a complaint for breach of contract, among other claims. (*Id*.) CPI

executives informed lower-level employees that Plaintiffs should receive "business as usual," and instructed  support personnel to provide Plaintiffs with all the support services they needed.  (Patel Decl. Ex. S.)

Scot Swisher ("Swisher") served as the field director for Plaintiffs' hospitals from 2011 to 2013.  (Patel Decl. Ex. U at 4-5.)  During that time he served twenty-one hospitals, eleven of which were CPI-owned practice hospitals.  (*Id*. at 5.)  Although he served roughly the same number of practice hospitals as charter hospitals, Swisher was instructed to prioritize serving practice hospitals, and Swisher spent more of his time at the practice hospitals under his direction.  (*Id*. at 5-6.)  Swisher testified he occasionally found it difficult to balance his responsibilities between charter hospitals and practice hospitals.  (*Id*. at 7.)  Swisher admitted he did not have as much time as he wished to spend at the charter hospitals.  (*Id*. at 13.)  However, Swisher was able to visit each of Plaintiffs' hospitals at least once per month.  (Patel Decl. Ex. I at 2.)

Plaintiffs' support from their medical director was similar.  For a time in 2013, the medical director position serving Plaintiffs' hospitals was vacant, and Swisher was forced to serve as both field director and medical director.  (Patel Decl. Ex. U at 9.)  The lack of a medical director negatively impacted Swisher's ability to do his job as field director, and during that time Swisher spent less "time as perhaps [he] would have liked or Dr. Baltzell would have liked because of [his] other responsibilities."  (Patel Decl. Ex. U at 10.)

In January 2013, Robin Stone ("Stone") was hired as medical director for the geographic area covering Plaintiffs' hospitals.  (Patel Decl. Ex. V at 2.)  Like Swisher, Stone spent more of her time at practice hospitals than charter hospitals and was ordered to prioritize the practice hospitals because they were her "direct reports."  (*Id*. at 12, 20.)  Moreover, Stone testified she never provided

any direct support to Plaintiffs' hospitals because Plaintiffs "never requested that [Stone] work with a specific doctor" in their hospitals.  (*Id*. at 23.)

In July 2014, after Fees had filed her complaint, Baltzell sent several questions to Christopher Stinnett ("Stinnett"), the CPI director of charter hospitals, regarding how Plaintiffs' hospitals could improve their profitability and growth.  (Patel Decl. Ex. JJ at 2.)  He also asked about a specific veterinary case and how best to move forward with treatment.  (*Id*. at 2.)  In response, Stinnett wrote back to Baltzell thanking him for getting in touch.  (*Id*.)  Stinnett then gave a vague explanation of how to maximize growth and concluded with the following:

> Were there not pending a lawsuit by you and Dr. Fees against CPI alleging as breaches of the CPI some of the very points raised in your e-mail, I would be more than happy to respond substantively and engage in a discussion with you on those topics.  However, given the allegations in that lawsuit and given the discovery requests of your lawyers, CPI's response will have to be in the process created by your lawsuit.

(*Id*. at 1.)  Plaintiffs interpreted this email as CPI's refusal to provide the support services allegedly due to Plaintiffs under the Charter Agreement.  (*Id*.)

II.  The Alleged Sexual Assault and Fees's Interaction with Aundre Pace

In November 2008, Fees attended a CPI conference in Portland, Oregon when the regional vice president in charge of Fees' geographic area introduced her to her new supervisor Aundre Pace ("Pace").  (Patel Decl. Ex. H at 36.)  Fees and Pace talked during the evening reception and later had several alcoholic drinks at a bar.  (*Id*. at 36-37.)  While at the bar, Pace placed Fees's hands on his crotch and forced her to rub his penis through his pants.  (*Id*.)  Fees withdrew her hand and rejected Pace's sexual advances.  (*Id*.)  Fees and Pace traveled back to the hotel where the conference was being held.  (*Id*.)  According to Fees, Pace followed her to her hotel room and sexually assaulted her. (*Id*.)

Two weeks after the alleged sexual assault, CPI in-house counsel Bruce Berning ("Berning") called Fees to ask about inappropriate behavior which allegedly occurred at the November 2008 conference.  (*Id.* at 29, 40.)  Although Berning was calling about a different incident of alleged misconduct which occurred at the conference, Fees told Berning that she was sexually assaulted by Pace at the symposium.  (*Id.* at 29.)  Berning told Fees he would "look into it" and that he would "take care of it."  (*Id.* at 30.)  Fees repeatedly asked Berning if she was in trouble and whether she needed to do anything, to which Berning replied, "no."  (*Id.* at 30.)  After the two hung up, Fees called Berning back to clarify whether she needed to do anything else, but again Berning said she was not in trouble and did not need to do anything because he "would take care of it."  (*Id.* at 30.)  Berning denies any knowledge of the alleged sexual assault and denies he was party to the telephone conversations in question.  (Patel Decl. Ex. BB at 2.)  By November 2009 when Fees attended the yearly conference, Pace was still in his supervisory position, leading Fees to believe CPI had no intention of reprimanding Pace or otherwise addressing the alleged sexual assault.  (Patel Decl. Ex. H at 31-32.)  However, Fees chose not to press the issue because she feared CPI would "find a reason to terminate " the Charter Agreement and sever the business relationship between Plaintiffs and CPI.  (*Id.* at 31-33.)

Despite Pace's alleged sexual advances, Fees continued to work with him because he was her supervisor and direct contact with CPI.  (*Id.*)  The record shows that the two remained in contact between 2008 and 2013 by phone and text message.  (CHC Decl. Ex. 21.)  In one exchange, from September 18, 2012, beginning around 11:00 P.M., the two exchanged benign conversation.  (*Id.*)  They lament that Pace was unable to "hang out" with Fees while he was in Ohio.  (*Id.*)  Thereafter, Fees tells Pace they should do something together.  (*Id.*)  She suggests they go on a bike ride, go on

a walk, go bowling, and eventually, suggested that Pace join her that evening to watch a movie on her laptop computer.  (*Id*.)

In the years that followed, Pace remained in his supervisory position of Plaintiffs' hospitals and regularly interacted with Fees at conferences and symposia.  (*See* Patel Decl. Ex. H at 44-45.) In January 2013, Pace and Fees attended a symposium in Florida, where Pace made comments about wanting to "get time alone" and "wanting to hook up" with Fees.  (*Id*. at 44.)  Similar incidents occurred at conferences hosted in February, April, July, and September 2013.  (*Id*.)  Each time, Pace told Fees he wanted to "hook up" and "get some time together alone" where they "can really work on things with [Fees's] hospitals."  (*Id*. at 45-46.)  Fees interpreted these comments to mean she would get support services from CPI only if she "g[o]t together with him."  (*Id*. at 52.)  Whenever Fees found herself alone with Pace, Pace would initiate physical contact by tugging on Fees's hair, tickling her waist, touching her hips, and putting his face close to her neck.  (*Id*. at 45-47.)

Fees was also offended by the subject matter of some conversations at two CPI events. Once, at a conference, Pace and a CPI medical director told a story about how a woman once accidentally grabbed Pace's crotch.  (*Id*. at 48.)  Several months later, Fees was having a conversation with Stinnett.  (*Id*. at 53.)  Fees asked Stinnett how his family was.  (*Id*. at 53.)  Stinnett responded that his twelve-year-old son gets on his wife's nerves often because, like Stinnett himself, the son "sits around scratching his balls all day . . . ."  (*Id.* at 53.)  Fees testified at her deposition that she was "appalled" by Pace's and Stinnett's choice of words and subject matter.  (*Id.* at 53-54.)

### Procedural Background

Fees, Grove City, and Heather Fees, DVM, LLC filed the original complaint on December 20, 2013, alleging claims for breach of contract, breach of the implied covenant of good faith and

fair dealing, and violation of Title VII. (Dkt. No. 1.) CPI moved to dismiss, and then answered the complaint. (Dkt. Nos. 18, 25.) In its answer, CPI alleged counterclaims for attorney fees under the contract and under Title VII. (Dkt. No. 25.) In a May 15, 2014 Findings and Recommendation, the court recommended granting CPI's motion to dismiss, and granting in part Plaintiffs' motion for leave to amend which Plaintiffs had filed a month earlier. (Dkt. Nos. 29, 39.) In July 2014, Judge Brown adopted the court's recommendation as her own. (Dkt. No. 51.)

On July 21, 2014, Fees filed her First Amended Complaint, to which Baltzell and Polaris joined as plaintiffs. The complaint still contained claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of Title VII, but Plaintiffs added claims for breach of Oregon civil rights statutes, negligent supervision and retention, and IIED. (Dkt. No. 52.) Three months later, Plaintiffs filed, and the court granted, an unopposed motion for leave to file their Second Amended Complaint. (Dkt. Nos. 61, 63.) Unlike the first two complaints, the Second Amended Complaint included claims for retaliation under Title VII and OR. REV. STAT. § 659A.030. (Dkt. No. 64.) In May 2015, Defendants filed the motion for summary judgment now before the court. (Dkt. No. 126.)

*Legal Standard*

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the movant meets his burden, the nonmovant must "go beyond the pleadings [ ] by her own affidavits . . . [to] designate specific facts showing that

there is a genuine issue for trial." *Id.* (internal quotation marks omitted). Conclusory allegations which are unsupported by factual material such as affidavits and documentary evidence are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). On summary judgment, the court is bound to view all facts in a light most favorable to the nonmovant and must draw all justifiable inferences in the nonmovant's favor. *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

*Discussion*

CPI moves for summary judgment on each of Plaintiffs' claims. CPI first contends all of Plaintiffs' claims are barred by the Release. In the alternative, CPI contends Plaintiffs' contract claims, employment claims, and state-law tort claims fail for a variety of claim-specific reasons. Plaintiffs responded to Defendants' arguments, and presented evidence they claim demonstrates genuine issues of material fact which preclude summary judgment. The court first addresses an evidentiary issue, then discusses Defendants' argument regarding the Releases and, thereafter, considers Defendants' claim-specific arguments.

I. Evidentiary Objection

Before the court discusses the merits of CPI's motion for summary judgment, it must resolve an evidentiary issue raised in CPI's Reply. Although CPI asserts that Plaintiffs "commit various evidentiary sins in their opposition brief," it takes issue primarily with Plaintiffs' introduction, and the court's consideration, of Exhibit O to the Patel Declaration ("Exhibit O").

Exhibit O is a one-hundred-eighty-nine page document consisting primarily of policy pronouncements. Each policy bears a header which includes boxes labeled "Policy Title," "Department/Function," "Policy Number," "Effective Date," "Originator," and "Approval." On

nearly all of the policy documents, these boxes have been left empty.  The body of each document

sets out specific practices and procedures on a wide variety of topics including: employee health

assessments, attendance policies, background investigations, competency assessments, the company

dress code, etc.

Plaintiffs contend Exhibit O is the "Operations Manual" referenced in the Charter Agreement

which governs specific aspects of how Plaintiffs were required to operate the charter hospitals.  CPI

argues that Exhibit O is unauthenticated and is not a policy manual binding on Plaintiffs' charter

hospitals.

Federal Rule of Civil Procedure 56(c)(2) provides that, "[a] party may object that the

material cited to support or dispute a fact cannot be presented in a form that would be admissible

in evidence."  Rule 56 continues:

> If a party fails to properly support an assertion of fact or fails to properly address
> another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment, if the motion and supporting materials — including the
> facts considered undisputed — show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

FED. R. CIV. P. 56(e).  For evidence to be "properly supported" and thus admissible, it must be

authenticated.  FED. R. EVID. 901.  "To satisfy the requirement of authenticating or identifying an

item of evidence, the proponent must produce evidence sufficient to support a finding that the item

is what the proponent claims it is."  FED. R. EVID. 901(a).

For the court to consider Exhibit O, Plaintiffs must meet the authentication requirement and

prove that Exhibit O is a policy manual binding on the Charter Hospitals.  They do not meet this burden.  Plaintiffs equivocate regarding the nature of the document at issue.  The Patel Declaration states that Exhibit O consists of "excerpts of the Smart Help files produced by Defendant in this case." (Patel Decl. ¶ 16.)  However, throughout their Response in Opposition, Plaintiffs cite Exhibit O as the "Operating Manual" binding Plaintiffs to the policies contained therein and referenced throughout the Charter Agreement.  Plaintiffs provide no evidence to prove Exhibit O is the "Operations Manual" or that the policies contained in Exhibit O are binding on Plaintiffs' hospitals.

Moreover, Exhibit O does not appear to be a finalized set of operating procedures as Plaintiffs contend, but draft policies which may or may not be enacted in the future.  The top of each policy includes the heading "Institution Name/Logo," apparently suggesting that the CPI name and logo would be added later.  None of the policies in Exhibit O include policy numbers where space is provided on the document.  Finally, and perhaps most telling, the "effective date," "revision date," and "approval" portions of the policies are all blank, suggesting that none of the policies were approved, implemented, revised, or effective at any time relevant to this case.  Because the Plaintiffs fail to properly authenticate Exhibit O as the Operations Manual, the court will not consider it in determining whether CPI is entitled to summary judgment on Plaintiffs' claims.

## II.  The Releases

CPI argues Plaintiffs' lawsuit fails in its entirety to the extent it is based on facts occurring prior to January 1, 2013, the effective date of the Releases.  Plaintiffs concede that they signed the Releases, but contend they do not bar Plaintiffs' claims.  First, they argue the Releases are not enforceable because they lacked consideration.  Second, they argue that, even if the Releases are enforceable, they serve only to waive Plaintiffs' contract claims which arose prior to the date the

parties authorized the Releases.

A. *Enforceability of the Releases*

Plaintiffs argue the Releases were not supported by consideration and thus are not enforceable. Defendants contend the Releases are incorporated into the Charter Agreement, and thus need not be supported by independent consideration.

Federal courts sitting in diversity must apply federal procedural law and the substantive law for the state in which the district resides. *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938). In matters of state law, federal courts interpreting and applying that state's law are bound by the decisions of the state's highest court or, if no decision exists, then it must apply the law as it believes the state's highest court would apply it. *See Ryman v. Sears, Roebuck and Co.,* 505 F.3d 993, 994 (9th Cir. 2007) ("Today we reiterate the rule that when (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it.") Contracts are governed by the laws of the states. Therefore, the court will apply Oregon law to construe the effect of the parties' releases on Plaintiffs' claims.

Agreements to release a party from liability are contracts subject to contract law. *See Steele v. Mt. Hood Meadows Ore., Ltd.*, 159 Or. App. 272, 280 (1999) (referring to a release agreement as a "contract" and applying contract law to determine the validity of such a release). For a contract to be enforceable in Oregon, there must be an offer, acceptance, and consideration. *McComas v. Bocci*, 166 Or. App. 150, 156 (2000). "A promise made after the creation of a contract and arising in the course of [one party's] performance is gratuitous and establishes no duty unless it is supported

by new consideration." *Id*.

However, where one party makes a promise in a writing separate from the larger contract, it need not be supported by independent consideration if that document is incorporated into another valid contract. *Arnett v. Bank of Am., N.A.*, 874 F. Supp. 2d 1021, 1030 (D. Or. 2012). "Under Oregon law, 'one document need not expressly incorporate the other by reference if the connection between them is unmistakable.'" *Id*. (quoting *McInnis v. Lind,* 198 Or. App. 139 (2005) (brackets omitted)).

> Oregon courts have identified three factors that, when present together, demonstrate that multiple documents should be construed as a single contract: (1) the documents are made by the same parties; (2) the documents are executed at or about the same time; and (3) the documents are part of the same transaction.

*Arnett*, 874 F. Supp. 2d at 1030 (internal citations omitted). Courts also consider whether the document to be incorporated "contains indicia or language of a contract" and "reflects the existence of a contract." *Id*.

In late 2012, Plaintiffs operated the charter hospitals pursuant to the Old Charter Agreements. The first and second Charter Agreements were signed by the parties on December 1, 2008, and the third was signed January 1, 2011. All three Charter Agreements were set to expire November 30, 2018.

While the Old Charter Agreements were still operative, the parties executed the New Charter Agreement. The parties also endorsed the Releases. (CHC Decl. Exs. 2-4.). The Releases are dated January 1, 2013, and contain the following provisions:

> 1. Release by Doctor and Company. Doctor and Company hereby release MMI, CPI, their affiliates, and MMI's CPI's and their affiliates' respective past, present, and future officers, directors, shareholders, employees, agents, successors and assigns from any claims, debts, liabilities, demands, obligations, actions, and causes of action, known or unknown, vested or contingent (collectively, the "Doctor-

Company Claims"), that Doctor or Company may now have or may have ever had relating to the CPI, the Related Agreements, or the Hospital.

2. <u>Complete Defense</u>.  All parties to this Release Agreement: (i) acknowledge that this Release Agreement shall be a complete defense to any and all Doctor-Company claims released under Paragraph 1 above; and (ii) consent to the entry of a temporary or permanent injunction to prevent or end the assertion of any such claims.

3. <u>Entire Agreement; Modification</u>.  This Release Agreement constitutes the entire agreement of the parties concerning its subject matter and may be modified only by a written document executed by all parties to this release Agreement.

(CHC Decl. Ex. 2-4 at 1-2.)

Although the Releases reference that the party to the Releases are also party to the Old Charter Agreements, they do not specifically reference the New Charter Agreements executed on January 1, 2013.  Instead, they reference the charter agreements "dated as of January 1, 2011" and December 1, 2008, and reference the parties' "desire to enter into a new CPI with the same expiration date."  (*Id*.)  The signature sheet of the Releases are not dated.  (CHC Exs. 2-4 at 3.)

CPI argues the Releases are part of the New Charter Agreement, and therefore need not be supported by independent consideration.  However, genuine issues of material fact exist regarding whether the Releases are incorporated into the New Charter Agreement.  There is no dispute that the parties to the Releases are identical to the parties to the New Charter Agreements.  Just like the New Charter Agreements, the Releases are signed either by Fees alone or by both Fees and Baltzell.  The releases are also signed by CPI and MMI representative Phil Freeman.  However, the record does not contain sufficient evidence to conclusively demonstrate the Releases were incorporated by reference into the new Charter Agreement.

First, it is unclear on what date Fees, Baltzell, and CPI executed the Releases.  The first paragraph of each Release provides that each "is effective as of the 1st day of January, 2013 . . . [,]"

FINDINGS & RECOMMENDATION - 17                                                    [RMD]

but the record does not contain documents or testimony regarding the date the Releases were executed. Second, the language of the Releases does not make clear whether they were part of the same transaction as the execution of the New Charter Agreements. The Releases do not make specific reference to the New Charter Agreements. Instead, they specifically mention that the Plaintiffs are parties to the Old Charter Agreements, and recites that Plaintiffs "desire to enter into a new CPA with the same expiration date. CPI is willing to enter into a new CPA subject to the terms and conditions of this release agreement." (CHC Decl. Exs. 2-4.) This language suggests that the releases were not incorporated into the New Charter Agreements or the Old Charter Agreements, but were intended to serve as an independent legal instruments. Because genuine issues of material fact exist as to whether the Releases were incorporated into the New Charter Agreements, the court cannot grant CPI summary judgment on that ground.

The court also concludes that the Releases are themselves enforceable contracts supported by consideration independent from the New Charter Agreements and Old Charter Agreements. "Consideration is defined as 'some right, interest, profit or benefit or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." *Homestyle Direct, LLC v. Dep't of Human Servs.,* 354 Or. 253, 262 (2013). Courts do not typically look to whether consideration is "adequate," but instead, look to whether each party to a contract has forgone a legal right he or she otherwise had prior to manifesting assent to the terms of the contract. *Pac. Pines Const. Corp. v. Young*, 257 Or. 192, 197-98 (1970).

The Releases contain mutual consideration and are themselves enforceable. The Plaintiffs gave consideration by abandoning and waiving all legal claims "relating to the CPI, the Related Agreements, or the Hospital." Thus, the Plaintiffs waived their previously held legal right to pursue

certain legal claims against CPI.  In exchange, CPI agreed "to enter into a new CPA."  By agreeing

to enter into a new Charter Agreement, CPI abandoned and waived its legal right to continue doing

business under the Old Charter Agreement.  Although one could argue that the relative value of the

parties' consideration is inequitable, the court "will not enter into an inquiry as to the adequacy of

the consideration."  *Id*.  Because the Releases are enforceable, they bar Plaintiffs' claims "relating

to the CPI, the Related Agreements, or the Hospital" which arose before January 1, 2013, the

effective date of the Releases.

### B.  Scope of the Releases

Because the Releases are enforceable as a matter of law, the court must determine which of

Plaintiffs' claims are barred by their terms.  At issue here is whether Plaintiffs' claims for breach

of contract, breach of the implied covenant of good faith and fair dealing, sexual harassment,

retaliation, negligence, and IIED are "claims . . . relating to the [Old Charter Agreements], the

Related Agreements, or the Hospital."  (CHC Decl. Ex. 2 at 1.)  CPI argues the Releases bar all of

Plaintiffs' claims arising before or based on events which occurred prior to January 1, 2013.

Plaintiffs disagree and contend the Releases act only to bar their breach of contract claims which

arose prior to January 1, 2013.  Because their claims arise from events which occurred after that

date, Plaintiffs claim, the Releases do not serve to preclude any claims at issue in this case.

The Ninth Circuit has long held that contract interpretation is a matter of substantive law to

which state law applies.  *Getlin v. Md. Cas. Co.*, 196 F.2d 249, 250 (9th Cir. 1952), *Snook v. St. Paul

Fire & Marine Ins. Co.,* 220 F. Supp. 314, 316-17 (D. Or. 1963) ("This being a diversity case,

jurisdiction is grounded on that fact and the [contract] must be interpreted and construed in

accordance with the Laws of Oregon, the place where the contract was made.").  "The primary and

governing rule of the construction of . . . contracts is to ascertain the intention of the parties." *Totten v. N.Y Life Ins. Co.*, 298 Or. 765, 770 (1985).  In Oregon, if the contract does not define the term or phrase in question, courts resort to a three-step analysis to determine the parties' contractual intent. *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Ore.*, 313 Or. 464, 469-471 (1992).  First, "[i]f the phrase in question has a plain meaning, we will apply that meaning and conduct no further analysis." *Holloway v. Republic Indem. Co.,* 341 Or. 642, 650 (2006).  Second, "[i]f the phrase in question has more than one plausible interpretation . . . we will examine the phrase in light of the context in which that [phrase] is used in the [contract] and the broader context of the [contract] as a whole." *Id.*  Third, if any ambiguity remains, the meaning of the ambiguous contract term is a question for the jury to decide.  *Id.*

By signing the Release, Plaintiffs agreed to waive all claims and debts they "may now have or may have ever had relating to the" Old Charter Agreement.  Whether one or more of Plaintiffs' claims is barred by the Releases' language depends on the plain meaning of the phrase "related to."  When divining the plain and ordinary meaning of a contract term, courts frequently resort to dictionary definitions for guidance.  *See Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507, 1513 (9th Cir. 1991) (Using dictionary definitions to determine the "lexicon of the ordinary person" and "plain meaning of the term 'damages.'"); *Employers-Shopmens Local 516 Pension Trust v. Travelers Cas. & Sur. Co. of Am.,* 235 Or. App. 573, 584 (2010) ("[W]e generally turn to dictionary definitions to determine the ordinary meanings of undefined terms . . . .").  The American Heritage Dictionary defines "related" as "1.  Being connected; associated. 2. Connected by kinship, common origin or marriage."  Similarly, it defines "relation" as a "logical or natural association between two or more things; relevance of one to another; connection."  AMERICAN HERITAGE

DICTIONARY OF THE ENGLISH LANGUAGE 1482 (5th ed. 2011).

### 1.  Contract Claims

The language of the Releases, pursuant to which Plaintiffs "release . . . CPI . . . from any claims . . . known or unknown, vested or contingent . . . that [Plaintiffs] may now have or may have ever had relating to" the Charter Agreement is not ambiguous as to Plaintiffs' claims for breach of contract.  The provisions of the Charter Agreements involve the business relationship between Plaintiffs and CPI and the manner in which Plaintiffs must operate their hospitals to protect CPI's trademarks and business practices.  The court must interpret the Releases' language in the context of the Releases' and the Charter Agreement's subject matter.

Plaintiffs' claims for breach of the Charter Agreement and breach of the implied covenant of good faith and fair dealing which arose prior to the effective date of the Releases are barred by the express terms of the Release.  However, Plaintiffs contend the Releases bar only those claims which arose prior to the execution of the Release, and they may still pursue their contract-related claims which arose after its execution and under the New Charter Agreements.  The court agrees, for two reasons.  First, the Releases bar claims which Plaintiffs "may now have or may ever had relating to the [Charter Agreements], the Related Agreements, or the Hospital." (CHC Decl. Ex. 2 at 1.)  This language does not release or otherwise reference claims which may accrue in the future.  Therefore, the Releases do not conclusively demonstrate the parties' mutual intent to release Defendants of liability arising after the Releases were executed.  Plaintiffs' Second Amended Complaint alleges contract claims based almost exclusively on CPI's alleged failure to provide support services in 2013 and 2014.  Because those claims were not yet vested and had not yet arisen at the time the Releases were executed, they are not barred under the Releases.

Second, the Releases do not operate to bar claims accruing in the future because that construction would bar Plaintiffs from bringing an action in contract in the event Defendants breached the terms of the New Charter Agreements.  This would render all Defendants' contractual promises illusory, and thus unenforceable.  If all of Defendants' contractual promises were illusory, the New Charter Agreements would fail for lack of consideration.  Oregon courts have a longstanding policy to "construe [] writing, if possible, so that it has meaning and validity." *Champion v. Hammer*, 178 Or. 595, 601 (1946) (citing 12 AM. JUR., *Contracts*, § 251).  This policy is consistent with the "illusory promises doctrine" as that doctrine has been interpreted by the U.S. Supreme Court.  *M & G Polymers USA, LLC v. Tackett*, — U.S. —, 135 S. Ct. 926, 936 (2015).  That doctrine "instructs courts to avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract.  *Id*.

Although no court in the Ninth Circuit has addressed this issue, the court's analysis of this issue is consistent with the approach taken by the Fifth Circuit in *Redel's Inc. v. General Electric Comp.*, 498 F.2d 95, 98-99 (5th Cir. 1974).  There, the plaintiff filed claims against the defendant for breach of contract and antitrust violations.  *Id*. at 97-98.  The defendant argued that a general release included in the franchise agreement governing the parties relationship applied prospectively to bar the plaintiff's claims.  *Id*.  The Fifth Circuit disagreed, explaining that:

> The question [] becomes whether the general release provision contained in the franchise agreement operates prospectively.  There are two answers, both of which conclusively deny prospective relief.  The first is found in the language of the release itself: '. . . The Dealer hereby releases General Electric Company from all claims, demands, contracts, and liabilities, if any there be, as of the date of the execution of this agreement by the Dealer . . . .'  The interpretation of any release of antitrust liability must be governed by the intent of the parties. . . .  Therefore, it must be concluded from the unambiguous language drafted by [the defendant] that the parties did not intend the release to apply prospectively beyond the franchise agreement's execution date of March 3, 1969.

*Id*. The court went on to conclude that, even if the parties intended to release the defendant from prospective contract and antitrust liability, the release would be void for public policy. *Id*. at 100.

Therefore, it is not reasonable to construe the Releases in this case to bar Plaintiffs' claims for breach of contract arising after the Releases was executed. On that basis, the court concludes the Releases do not bar Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing which accrued after January 1, 2013.

2. Plaintiffs' Employment Claims

CPI contends the Releases also bar Plaintiffs' claims for sexual harassment and retaliation. They contend that the plain language of the Releases unequivocally demonstrates the parties' intent to release these tort and unemployment claims. The court disagrees.

The court concludes that the language of the Releases is unambiguous and does not operate to bar Plaintiffs' employment claims. "A contractual provision is ambiguous if its wording, in context, is reasonably susceptible to more than one plausible interpretation." *Copeland Sand & Gravel, Inc. v. Estate of Dillard*, 267 Or. App. 791, 794 (2014). Here, the Releases must be construed in the context of the Charter Agreements to which they apply. When doing so, reasonable could not disagree that the plain meaning of the phrase "relating to the [Charter Agreement], the Related Agreements, or the Hospital" does not apply to bar Plaintiffs' claims for sexual harassment and retaliation. Neither the Releases nor the Charter Agreements make mention of employment discrimination, sexual harassment, or retaliation and contain no language which demonstrates an objective manifestation of the Plaintiffs' intent to waive and release employment discrimination claims. Instead, these documents are concerned solely with the contractual business relationship arising between the LLC Plaintiffs and CPI. Given the dictionary definition of "related," it is

counterintuitive to say that claims for sexual harassment and retaliation are "related" to the contract's subject matter. Therefore, the court should deny this portion of CPI's motion for summary judgment.

### 3. Plaintiffs' Tort Claims

CPI next argues the Releases bar Plaintiffs' tort claims for negligence and IIED. The court disagrees. Agreements to exonerate a party from liability or to limit the extent of the party's liability for tortious conduct are "not favorites of the court but neither are they automatically voided." *Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Starplex Corp.*, 220 Or. App. 560, 576 (2008) (quoting *Estey v. MacKenzie Eng'g Inc.*, 324 Or. 372, 376 (1996)). Because courts disfavor these liability-limiting documents, courts require that parties seeking to contract away tort liability do so in clear, unequivocal terms. *Steele v. Mt. Hood Meadows Ore., Ltd.*, 159 Or. App. 272, 276 (1999) (citing *Estey*, 324 Or. at 376). In determining whether the parties to a contract "clearly and unequivocally expressed" their intent to waive tort liability, the court considers 'both the 'language of the contract' and the 'possibility of harm or inequitable results that would fall on one party' if the other were immunized from the consequences of its own" tortious conduct. *Steele*, 159 Or. App. at 276. "The latter inquiry turns on the 'nature of the parties' obligations and the expectations under the contract.'" *Id.*

Here, the parties did not clearly and unequivocally express their desire to absolve CPI of all tort liability. An employer's tortious behavior is not "related" to the subject matter of the Charter Agreements. Therefore, the Releases do not bar Plaintiffs' tort claims for negligent supervision and retention and IIED.

### III. Plaintiffs' Civil Rights Claims Under Title VII and OR. REV. STAT. § 659A.030

Plaintiffs allege employment claims for hostile work environment and retaliation under Title VII and OR. REV. STAT. § 659A.030. Defendants now move for summary judgment on those claims and argue: (1) neither Fees nor Baltzell was an "employee" of CPI entitled to bring employment claims under state and federal law; (2) Plaintiffs failed to exhaust their administrative remedies; (3) Plaintiffs' claims are barred by the statute of limitations; (4) the organizational plaintiffs have no standing to pursue employment claims; (5) no reasonable jury could find in Plaintiffs' favor based on the evidence; and (6) Plaintiffs cannot prove they suffered an injury compensable under the relevant statutes.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The language of Oregon's anti-discrimination statutes are nearly identical, and similarly prohibit discrimination on the basis of sex. OR. REV. STAT. § 659A.030. Employment discrimination statutes also prohibit an employer from retaliating against an employee exercising his or her rights under Title VII and OR. REV. STAT. § 659A.030. *Sereno-Morales v. Cascade Food Inc.*, 819 F. Supp. 2d 1148, 1153 (D. Or. 2011). At issue here are claims for both sexual harassment and retaliation, and CPI moves for summary judgment on both.

### A. Hostile Work Environment

Only Fees asserts the hostile work environment claim. She alleges CPI fostered a hostile work environment on the basis of sex and that she was subject to unwanted sexual advances and comments by CPI employees. CPI contends her claims fail as a matter of law because: (1) Fees is not an employee entitled to statutory protection; (2) she failed to exhaust her administrative

remedies; (3) her claims are barred by the statute of limitations; and (4) to the extent her claims are not barred by the statute of limitations, she cannot produce evidence of a hostile work environment.

      1.  Fees's Status as an Employee

CPI argues no reasonable jury could find Fees was CPI's employee and is not entitled to the protections of Title VII and OR. REV. STAT. § 659A.030.  Title VII and § 659A.030 were enacted for the purpose of eliminating discrimination in employment based on "race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e(a), *Lucher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980).  "Consequently, there must be some connection with an employment relationship for Title VII [and state employment-discrimination] protections to apply."  *Id.*

To determine whether a plaintiff is an employee under Title VII, the court analyzes the "economic realities" of the business relationship.  *Id.*  "The extent of the employer's right to control the means and manner of the worker's performance is a primary factor" in the analysis.  *Id.*  However, the court must also analyze the following factors:

> (1) the skill required; (2) the source of the instrumentalities and tools utilized by the worker; (3) the location of the work; (3) the duration of the relationship between the parties; (4) whether the hiring party has the right to assign additional projects to the hired party; (5) the extent of the hired party's discretion over when and how long to work; (6) the method of payment; (7) the hired party's role in hiring and paying assistants; (8) whether the work is part of the regular business of the hiring party; (9) whether the hiring party is in business; (10) the provision of employee benefits; and (11) the tax treatment of the hired party.

*Murray v. Principal Fin. Group, Inc.*, 613 F.3d 943, 945-46 (2010); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1991).[2]

---

[2]Although the *Darden* court analyzed whether the plaintiff was an "employee" under the Employee Retirement Income Security Act ("ERISA"), courts in the Ninth Circuit have held that the *Darden* factors are equally applicable to Title VII cases.  *Murray*, 613 F.3d at 945-46.

Under Oregon law, courts determine whether the plaintiff is an "employee" entitled to the protections of civil rights statutes by applying the "right to control" test. Under this test, the court considers four factors: (1) whether there is direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire." *Slayman v. FedEx Ground Package System, Inc.*, 765 F.3d 1033, 1042 (9th Cir. 2014). Of those factors, direct evidence of a right to control is the most important factor, and similar to federal law, recitation of an independent-contractor relationship in an employment agreement is not dispositive. *Id.*

Fees is the owner and agent of several limited liability companies that have entered into the Charter Agreement. The Charter Agreement repeatedly refers to and places restrictions on the behavior of "You," which it defines as "the Person(s) who enters into this Agreement with CPI and any Person(s) who succeeds to an interest in this Agreement by Transfer or by operation of law." (CHC Decl Ex. 1 at 13.) In turn, the Charter Agreement defines "Person" as "any individual or group of individuals, any partnership, trust, limited liability company, limited liability partnership, corporation, governmental authority or other entity of any nature, public or private." (CHC Decl. Ex. 1 at 12.) On the signature page of the agreement next to the word "You:," Fees signed twice; first on a signature line above "Heather M. Fees, DVM, Individually" and again on behalf of Heather Fees, DVM, LLC in her capacity as its "Managing Member." (CHC Decl. Ex. 1 at 64.)

Although Fees signed the Charter Agreement in her individual capacity, the terms of the agreement place few restrictions on her personally. No portion of the agreement requires Fees to personally serve as a veterinarian in the Charter hospitals, and Fees was free to hire staff and delegate operational responsibilities. In 2008, Fees took advantage of that freedom by transitioning

out of her work as a hospital veterinarian and into a "leadership and management" position. (CHC Decl Ex. 5 at 33.) Also in 2008, Fees hired Laura Donaldson as the "director of operations for the four hospitals" Fees owned at the time. (CHC Decl. Ex. 8 at 2.) Fees also set her own salary without input from CPI and paid Social Security taxes out of her wages. (CHC Decl. Ex. 12 at 12.) Because Fees was free to delegate all of her management responsibilities under the Charter Agreement, any control CPI had over the operation of the hospitals did not necessarily apply to the details of how Fees undertook her personal responsibilities. Thus, CPI does not have a "right to control" Fees, the hallmark of both the federal and state-law tests for whether a plaintiff is an "employee."

The record also contains multiple statements and affirmations, in writing and during deposition, that Fees was not an employee of CPI. Defendants' exhibits 13, 14, 15, and 18 are single-page documents signed by Fees which state that Fees is "not an employee of [CPI] or any of its affiliates . . . ." (CHC Decl. Exs. 13-15, 18.) Pursuant to these documents, which are titled "ACKNOWLEDGMENT BY CHARTER PRACTICE EMPLOYEE," Fees states that she is an employee of Heather Fees, DVM, LLC or Grove City Veterinary Service, LLC (the "Employers"). These "acknowledgments" state that the LLC Plaintiffs are:

> solely responsible for all hiring and termination decisions; for establishing the terms and conditions of [Fees's] employment; for determining what employment benefits, if any, to provide; and for paying and providing for [Fees's] compensation, all required income tax, FICA, and other withholdings, and all [Fees's] employment benefits, including but not limited to any and all sick leave, vacation pay, social security benefits, workers' compensation, unemployment compensation and health insurance.

(CHC Decl. Exs. 13-15, 18.)

Moreover, during a July 18, 2011 deposition taken for a separate legal matter, Fees testified

that she was not an employee of CPI or its affiliate companies.  (CHC Decl. Ex. 12 at 4-5.)  Instead, she testified that she was "an employee of Heather Fees DVM, LLC."  (*Id.*)  Fees's testimony and contractual affirmations that she is not a CPI employee are not dispositive, but due to the nature of the business relationship between Fees, the LLC Plaintiffs, and CPI, particularly the freedom Fees had to delegate management authority, the court concludes no reasonable jury could find Fees was an "employee" of CPI subject to the protections of federal and state employment discrimination statutes.  Because Fees is not CPI's employee, she cannot prove an essential element to her hostile-work-environment claims, and the court should grant CPI summary judgment.

    B.  *Retaliation*

    All Plaintiffs joined in counts four and six of the Second Amended Complaint, in which they allege claims for retaliation under Title VII and OR. REV. STAT. § 659A.030.  They allege that, after Fees asserted her rights under Title VII and Oregon law to oppose CPI's alleged sexual harassment, CPI retaliated by refusing to provide support services in the form of field director and medical director support.  CPI moves for summary judgment on all of Plaintiffs' retaliation claims and argues: (1) none of the Plaintiffs are statutorily eligible to pursue retaliation claims under federal or state law; (2) the Plaintiffs did not exhaust their administrative remedies; (3) the retaliation claims are barred by the statute of limitations; (4) Baltzell cannot demonstrate he asserted rights under Title VII and OR. REV. STAT. § 659A.030 for which CPI retaliated; and (5) Plaintiffs were not subject to an adverse employment action which could give rise to a retaliation claim.

        1.  Eligibility to Pursue a Retaliation Claim

    CPI argues none of the Plaintiffs are statutorily eligible to bring retaliation claims.  First, they argue Fees and Baltzell are not "employees," and thus cannot prove a necessary element of their

retaliation claims.  Second, they contend that the LLC Plaintiffs are not "persons" under the relevant statute and thus do not have standing to bring a claim for retaliation.  The statutory language of Title VII and Oregon law differ slightly on who may bring a retaliation claim.  Therefore, the court will analyze the Title VII claims and state-law claims separately.

The court already determined that Fees was not an employee under the "economic realities" and "right to control" tests.  Baltzell, as a member of Polaris, is similarly situated.  He is free to delegate his management responsibilities to others.  Because Plaintiffs produce no authority for their contention that a member and employee of an LLC may be considered an "employee" of a business with whom that LLC contracts, the court concludes Baltzell is not CPI's employee and thus cannot sustain a retaliation claim under federal or state law.  The court will now analyze whether the LLC Plaintiffs are CPI's employees.

<blockquote>a.  Title VII</blockquote>

Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a).  This section applies to putative plaintiffs and defendants differently depending on the nature of their respective role.  The first clause applies only to "employers," and the latter two clauses apply to "employment agencies," "labor-management committees," and "labor organizations."

The parties do not dispute that CPI is an "employer" as that term is defined by Title VII. Under § 2000e-3, "employers" may be liable for retaliation only if the employer "discriminate[s] against any of his employees or applicants for employment." The Plaintiffs do not argue they are or were "applicants for employment." Therefore, the LLC Plaintiffs may pursue their Title VII retaliation claims only if they were "employees" as that term is defined by Title VII.

Section 2000e defines "employee" generally as "an individual employed by an employer," and excludes specific classes of individuals from the general definition. 42 U.S.C. § 2000e(f). At first glance, this definition by itself does not inform the court's analysis; only after one contrasts this definition with the statutory definition of "person" does congressional intent become clear. Title VII defines "person" to include "individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, [and] unincorporated organizations . . . ." 42 U.S.C. § 2000e(a). An LLC is an "unincorporated organization," so for the purposes of Title VII, the LLC Plaintiffs are "persons" under the statute. However, § 2000e-3 does not grant a retaliation cause of action to "persons," but to "employees," which is defined with reference to the word "individuals" and not "persons." Congress's omission of the word "person" from the definition of "employee" and the statutory section providing a cause of action for retaliation evidences the legislative intent to exclude business entities, including the LLC Plaintiffs, from the class of "individuals" eligible to sue an employer for Title VII retaliation. Because no Plaintiff may pursue a Title VII claim for retaliation, CPI is entitled to summary judgment on Plaintiffs' fourth claim for relief.

### b. Oregon Law

Although a multitude of caselaw exists for the proposition that analyzing retaliation claims

under Title VII and OR. REV. STAT. § 659A.030 is materially identical, the language of the retaliation provisions differ in significant ways, compelling an independent analysis of whether Plaintiffs may pursue their retaliation claims.  Oregon law makes it an unlawful employment practice for "any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so." OR. REV. STAT. § 659A.030(1)(f).  In turn, § 659A.001(9) defines "person," in relevant part, as "[o]ne or more individuals, partnerships, associations, labor organizations, [or] limited liability companies."

Under the text of the statute, it would appear that Fees and Baltzell, and the LLC Plaintiffs, as individuals and limited liability companies respectively, constitute "persons" who may pursue a retaliation claim against another "person" who commits retaliation after the plaintiff engages in protected activity.  Despite the statutory text, which does not include the word "employee" and appears to include LLCs among those who have standing to sue for retaliation, Oregon courts and courts in this district have consistently held that an employer-employee relationship must exist between the plaintiff and the defendant for the plaintiff to prevail in a claim for retaliation.  *Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 709 (2012); *Roberts v. Legacy Meridian Park Hosp., Inc.*, 3:13-cv-01136-SI, 2014 WL 294549, at *9 (D. Or. Jan 24, 2014).  The court has already determined neither Fees nor Baltzell is a CPI employee.  Further, Plaintiffs produce no authority for the proposition that a business association may be considered an "employee" for purposes of an Oregon employment retaliation claim. Therefore, CPI is entitled to summary judgment on Plaintiffs' state-law retaliation claims.

IV. Contract Claims

Plaintiffs contend CPI committed breach of contract and breach of the implied covenant of good faith and fair dealing by failing to provide the support services promised under the Charter Agreement. CPI contends it is entitled to summary judgment on both claims because it did not breach the explicit terms of the contract. Moreover, CPI argues it cannot be held liable for breach of the implied covenant of good faith and fair dealing because the implied covenant of good faith and fair dealing cannot be used to expand the express terms of a contract.

*A. Breach of Contract*

Plaintiffs contend CPI breached Section 4.5 of Charter Agreement "by ignoring and/or failing to honor Plaintiffs' request for supplemental support, services and training." (Compl. ¶ 87.) CPI argues it is entitled to summary judgment because CPI did not breach the Charter Agreement and, even if it did, Plaintiffs cannot prove they were damaged by the breach.

To succeed in a claim for breach of contract, the plaintiff must prove: (1) the existence of an enforceable contract; (2) the relevant terms of that contract; (3) the plaintiff fully performed; (4) the defendant breached the contract; and (5) damages. *Slover v. Ore. State. Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996). Here, the parties agree that the Charter Agreement is an enforceable contract and that Plaintiffs fully performed under the contract. Moreover, they do not dispute the relevant terms of the contract, as both Plaintiffs and CPI submitted identical copies of the Charter Agreement into the record. However, after reviewing the record, the court concludes CPI did not breach the Charter Agreement, and summary judgment should be granted in its favor on Plaintiffs' claim for breach of § 4.5 of the Charter Agreement.

Plaintiffs allege in their complaint that the only contract term CPI violated was section 4.5

of the Charter Agreement ("Section 4.5"), which relates to training of Plaintiffs' employees. Thus, at issue are the parties' respective interpretations of Section 4.5. That section provides:

> 4.5 <u>Training Requested by You</u>
>
> Upon not less than 30 days' prior written notice to CPI, You may request additional training at CPI's training center or at other agreed upon locations. The duration and cost of training is negotiable depending upon your needs and is subject to available training space and staff.

(CHC Decl. Ex. C at 19.) The parties disagree on what duties arise under Section 4.5. Plaintiffs claim Section 4.5 confers on them a right to receive "support services" from CPI in the form of hiring, recruiting, training, and direct medical support on specific veterinary cases. (CHC Decl. Ex. 5 at 44:21-24, 46:18-19, 48:18-19.) CPI disagrees and urges the court to interpret Section 4.5 in a narrow, textual manner: they contend Section 4.5 confers only the right explicitly articulated — the right to receive training after "not less than 30 days' prior written notice to CPI."

While it is possible that Section 4.5 is susceptible to more than one interpretation, it is not susceptible to the interpretation urged by Plaintiffs in this case. The American Heritage Dictionary of the English Language defines "training" as "1. The process or routine of one who trains. 2. The state of being trained." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1842 (5th ed. 2011). It defines "train," in relevant part, as "1. To coach in or accustom to a mode of behavior or performance. 2. To make proficient with specialized instruction or practice. 3. To prepare physically as with a regimen." *Id.* at 1842. Nothing in this dictionary definition suggests that the word "training" encompasses a broader category of "support services." Moreover, Plaintiffs do not produce any language in the broader Charter Agreement which would support their interpretation of the term "training" as it is used in Section 4.5. Plaintiffs rely only on extrinsic evidence to suggest the intent of the parties differs from the plain meaning of the contract's text.

The plain meaning of Section 4.5 requires CPI to provide Plaintiffs training, in the form of informational presentations, literature distribution, and coaching only after Plaintiffs provide CPI with thirty-days' written notice of their desire to be trained. Further, nothing in the four corners of the Charter Agreement suggests Section 4.5 provides Plaintiffs a right to recruiting services, hiring services, or veterinary consultation upon request. Because the plain meaning of Section 4.5 is apparent based on the four corners of the contract, the court need not consider extrinsic evidence. Therefore, to the extent Plaintiffs' claims for breach of contract rely on their right to receive non-training "support services," their claim fails as a matter of law and CPI is entitled to summary judgment.

To the extent the Plaintiffs claim CPI breached the Charter Agreement by failing to provide training after written notice, their claims fail as a matter of law. CPI produced evidence which suggests Plaintiffs have been provided all the training they requested. Stinnett, CPI's director of charter operations, declared that he was unaware "of any instance in which Fees or Baltzell have requested additional training under Section 4.5 of the CPI and not received it." (Stinnett Decl. ¶ 15.) As it is used here, thirty-days' written notice is a condition precedent to CPI's duty to train Plaintiffs. Thus, for CPI to breach Section 4.5, CPI must have withheld training after Plaintiffs gave a written request. Plaintiffs produce no evidence which shows they made any request for training which went unfulfilled. Plaintiffs cannot meet their burden of showing CPI breached Section 4.5 of the Charter Agreement. Therefore, CPI is entitled to summary judgment on Plaintiffs' claim for breach of contract.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs also allege CPI breached the implied covenant of good faith and fair dealing by

failing to provide the level of support services Plaintiffs reasonably anticipated would be provided under the Charter Agreement. Defendants move for summary judgment and contend they acted at all times in good faith, and that Plaintiffs' claim for breach of the implied covenant is merely an attempt to expand the express terms of the Charter Agreement beyond their reasonable bounds. CPI also argues Plaintiffs cannot prove damages, an essential element of their claim.

"All contracts include an implied covenant of good faith and fair dealing." *Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 661 (2007). The primary purposes of the implied covenant are to "facilitate performance and enforcement of the contract" and "protect the objectively reasonable contractual expectations of the parties." *Id.*, *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000). "[H]owever, the implied covenant of good faith and fair dealing does not vary the substantive terms of the contract or impose obligations inconsistent with the terms of the contract." *Morrow*, 212 Or. App. at 662. Instead it "focuses on the 'agreed common purpose' and the 'justified expectations' of the parties, both of which are intimately related to the parties' manifestation of their purposes and expectations in the express provisions of the contract." *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010). In other words, it "serves to effectuate the objectively reasonable expectations of the parties." *Id.* "Whether a party has breached the covenant of good faith and fair dealing is a question of fact." *Best v. U.S. Nat'l Bank of Ore.*, 78 Or. App. 1, 13 (1986).

1. Actual Breach of the Implied Covenant

Aside from section four of the Charter Agreement, which sets out the guidelines for CPI's training regimen and CPI's duty to provide additional training for Plaintiffs' employees upon request, the Charter Agreement does not explicitly describe the "support services" in the areas of

FINDINGS & RECOMMENDATION - 36                    [RMD]

recruiting, hiring, and support with individual veterinary cases. Therefore, this is not a case in which the plaintiff seeks to contradict an explicit contract provision via the implied covenant of good faith and fair dealing. Instead, Plaintiffs posit that, due to CPI's extra-contractual conduct and statements, they had an objectively reasonable belief they would receive "support services." Because they did not receive the services promised, Plaintiffs argue CPI violated their reasonable expectations under the contract, and are in violation of the breach of the covenant of good faith and fair dealing.

Plaintiffs introduce evidence which shows it was not unreasonable to expect CPI would provide support services under the Charter Agreement. Fees testified at deposition that, in exchange for royalty payments under the Charter Agreement, she expected CPI to provide recruiting and hiring services, as well as "medical director support and field director support" to fine-tune the business and veterinary aspects of her practices. (CHC Decl. Ex. 5 at 43-52.) She also testified she received these services from CPI prior to 2008, but that the level of services declined thereafter, particularly after October 2008. (CHC Decl. Ex. 5 at 60:14-18.) CPI's finance manager Kim Chan testified that Plaintiffs' royalty payment under the Charter Agreement covers the cost of "support services" including "the medical protocols in the hospitals, [] cascading any information from our weekly calls and then to provide guidance on any other medical questions that they may have." (Patel Decl. Ex. T at 15, 20.) Finally, Plaintiffs' evidence suggests that CPI encouraged Plaintiffs to expect identical support services as practice-owned hospitals under the concept of "One Banfield," but that CPI field directors and medical directors, at the direction of their supervisors, prioritized providing services to CPI-owned practice hospitals over charter hospitals like those operated by Plaintiffs. (Patel Decl. Ex R (defining the "One Banfield" concept as "same expectations; same opportunities; and same resources" for both practice-owned and charter-owned

veterinary hospitals); Patel Decl Ex. U at 13; Ex. V at 12.)  For example, Field Director Scot Swisher testified that, upon being hired, his superiors explained that he should prioritize serving CPI's practice-owned hospitals, and Medical Director Robin Stone testified that she visited nearby practice-owned hospitals disproportionately more than she visited Plaintiffs' hospitals.  (Patel Decl. Ex. U at 6; Ex. V at 12:19-25.)

The Charter Agreements do not specifically articulate CPI's obligation to provide Plaintiffs with the services and advice of a field director and a medical director, but the evidence of record clearly demonstrates that CPI contemplated Plaintiffs were owed those services under the contract. Therefore, because the parties reasonably expected that Plaintiffs would receive these services under the contract, CPI had a duty under the implied covenant of good faith and fair dealing to supply them.  However, a genuine issue of material fact exists as to whether CPI supplied services sufficient satisfy its obligation under the implied covenant.  Therefore, CPI is not entitled to summary judgment on Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing.

2.  Damages.

CPI argues Plaintiffs cannot succeed on their claim for breach of the implied covenant because they cannot prove CPI's alleged breach resulted in damages.  According to CPI, Plaintiffs' financial manager Eddy Gomer ("Gomer") did not produce a Rule 26 expert report, and testified at deposition that he formed no opinions about the damages CPI's alleged breach caused to Plaintiffs. Further, Gomer is Plaintiffs' only witness who would be in a position to opine on the damage caused by CPI's alleged breach.  Because Gomer formed no opinion at the time and will not be testifying as an "expert witness" during trial, CPI argues Plaintiffs cannot prove the essential damages element of their claim for breach of the implied duty of good faith and fair dealing.

During his deposition, Gomer repeatedly and unequivocally testified that he formed no opinions about the causal relationship between CPI's lack of support services and Plaintiffs' financial position during the time he was employed as Plaintiffs' financial advisor.  Gomer is Plaintiffs' only witness who would potentially have the expertise to opine on the causal link between CPI's alleged reduction in support services and Plaintiffs' alleged damages.  Thus, Plaintiffs cannot present evidence which creates a question of fact whether they suffered actual damages.

Plaintiffs argue the court should deny CPI's motion on the damages issue because the parties are not required to disclose retained experts until after the court decided summary judgment motions, but this argument overlooks Plaintiffs' burden on summary judgment.  CPI presented evidence that demonstrated an absence of evidence to support Plaintiff's claim for damages based on breach of the implied covenant of good faith and fair dealing.  Importantly, Plaintiffs and their financial manager, Eddy Gomer, served as the source of CPI's evidence: both Fees and Baltzell testified at deposition they did not know what damages they incurred because of CPI's alleged failure to provide support services, and both deferred to Gomer for that information. But Gomer had no such information -- as previously noted, he testified at deposition he had formed no opinions about Plaintiffs' damages cause by CPI's alleged failure to provide support services.

Here, CPI supported its summary judgment motion with testimony from Plaintiffs and their expert to show Plaintiffs lack any evidence to support their claim for damages under the implied covenant of good faith and fair dealing.  The burden of production thus shifted to Plaintiffs to submit evidence that created a genuine factual dispute on this issue.  Plaintiffs failed to submit such evidence -- or any evidence at all -- to refute CPI's showing.  Although the parties' expert disclosures were not due until after the court ruled on summary motions, CPI's production of evidence on

summary judgment required Plaintiffs, under Rule 56's clear directive, to cite to particular materials record to support their assertion "that a fact is genuinely disputed." FED. R. CIV. P. 56(c)(1). Rule 56 contains no exceptions to this requirement based on general scheduling deadlines set by the court, and those scheduling deadlines do not override Rule 56's specific and clear requirement that non-moving parties must produce evidence sufficient to create a question of fact.

The court also notes that at no time did Plaintiffs seek relief under Rule 56(d) for time to obtain evidence allegedly not available to them. Rule 56 contemplates situations, such as those in this case, where a non-moving party does not have evidence needed to response to the moving party's evidence and needs time to obtain it. Plaintiffs at no time sought additional time to obtain and present that evidence, instead choosing to respond only with the argument that they were not yet required to produce such evidence. As discussed above, that argument is not sufficient under Rule 56 to defeat a moving party's proper evidentiary submission.

Even though Plaintiffs are precluded from recovering actual damages for breach of the implied covenant of good faith and fair dealing, Plaintiffs' claim should not be dismissed. In Oregon, a plaintiff may collect nominal damages "where there has been a breach of a contract, and no actual damages whatever have been or can be shown." *City of Rainier v. Masters*, 79 Or. 534, 542-43 (1916), *See also Sunnyside Land & Imp. Co. v. Willamette Bridge Ry. Co.*, 20 Or. 544, 546 (1891) ("The complaint sets out a contract between the parties, and avers a breach thereof by defendant. The demurrer, admitting the truth of the complaint, the plaintiff is entitled to nominal damages at least . . . ."). Thus, although Plaintiffs may not present evidence at trial that they suffered actual damages as a result of CPI's breach of the implied covenant of good faith and fair dealing, CPI is not entitled to summary judgment because Plaintiffs may still recover nominal

damages if they are able to prove the remaining elements of their contract claim.

V.  Negligent Supervision and Retention

Fees alleges CPI was negligent in supervising and retaining Pace after he sexually assaulted her in November 2008.  CPI argues it is entitled to summary judgment on Plaintiffs' negligence claim because: (1) Fees's claim is barred by Oregon's two-year statute of limitations; (2) any behavior which occurred during the two-year limitations period does not give rise to a negligence claim; and (3) Fees cannot prove she suffered damages caused by CPI's negligence.

A.  Statute of Limitations

CPI contends it is entitled to summary judgment on Plaintiffs' claims for negligent supervision and retention in part because Plaintiffs' claims are time-barred by Oregon's two-year statute of limitations for negligence cases.  Fees argues her claims are not time-barred because she was subject to a "continuing tort."  Fees also argues that, even if the statute of limitations bars her claims to the extent they are premised on conduct which occurred less than two years before she filed this lawsuit.

To succeed in a claim for negligent supervision and retention, the plaintiff must prove: (1) the defendant employed an individual "with known dangerous propensities, or dangerous propensities which could have been discovered by a reasonable investigation;" (2) despite the employer's knowledge of the employee's dangerous propensity, the employee remained "in a position where it is foreseeable that he could injure the plaintiff in the course of the work;" (3) the plaintiff was injured by the employee; and (4) the plaintiff's injury should have been foreseeable given the employee's dangerous propensity. *Gresham v. Safeway, Inc.*, Civ. No. 08-6241-AA, 2010 WL 437982, at *11 (D. Or. July 7, 2010) (quoting *Chesterman v. Barmon*, 82 Or. App. 1, 4 (1986)).

Like all negligence claims in Oregon, claims for negligent retention are subject to a two-year statute of limitations. OR. REV. STAT. § 12.110(1).

Plaintiffs filed their complaint on December 20, 2013, and although the negligent retention claim was not joined until Plaintiffs filed their First Amended Complaint on July 21, 2014, that claim relates back to the date the original complaint was filed because the negligent retention claim "arose out of the conduct, transaction, or occurrence set out . . . in the original pleading" to make out Fees' claim for sexual harassment. FED. R. CIV. P. 15(c)(1)(B). (Dkt. Nos. 1, 52.) Thus, unless an exception applies, Fees' negligent retention claim must have accrued on or after December 20, 2011. A claim accrues "when the plaintiff knows, or should know, of the injury which is the basis of the cause of action. *Fink v. Shedler*, 192 F.3d 911, 913 (9th Cir. 1999).

Here, Fees alleges that she put CPI on notice of Pace's sexually violent proclivities in November 2008, when Fees reported to Berning that Pace had sexually assaulted her. Thereafter, Fees alleges, CPI was negligent in continuing to employ Pace as her supervisor and direct CPI contact. However, the ultimate injury in a negligent retention case is not the original event which gives rise to knowledge of the employee's dangerous proclivity. Instead, it is the ultimate injury to the plaintiff which the employer should have foreseen due to its knowledge of the dangerous proclivity.

Fees's injury which gives rise to her negligence claim is Pace's alleged sexual harassment. The record contains little information about specific instances of sexual harassment between November 2008 and August 2012. Fees makes only vague references in her deposition to her interaction with Pace during this period of time, when Pace would "put his hands on [Fees's] body, make sexual comments such as 'let's hook up later, let's meet alone so I can help you with your

hospitals.'" (Pl.'s Resp. at 14-15; Patel Decl. Ex. H at 41.)

The bulk of Pace's alleged sexual harassment occurred at professional conferences in 2013. At a February 2013 conference in Orlando, Florida, Pace told Fees he "wanted to get together" to have some "time alone" and wanted to "hook up."  (Patel Decl. Ex. H at 44.)  At an April 2013 conference, Pace tickled Fees's waist, tugged at her hair and told Fees he wanted to "hook up" later. Fees invited Pace to dinner with some other conference attendees, but Pace declined the invitation, and instead told Fees that he would like to "get some time together alone . . . [to] really work on things with [Fees's] hospitals." (Patel Decl. Ex. H at 45.)  Pace's behavior continued at conferences in July and September 2013, when Pace put his hands on her waist, put his face near her neck, suggestively "look[ed Fees] up and down," and told her she "smelled good."  (Patel Decl. Ex. H at 45.-46.)  Finally, at the September 2013 conference, Pace told a story to a group of people, including Fees, about how a woman with whom he worked accidentally "grabbed his crotch" once.

The portions of the record which evidence Fees's "ultimate injury" of being sexually harassed by Pace do not contain information about specific injurious conduct prior to August 2012. Because all of the allegedly injurious conduct occurred after December 2011, Fees's negligent retention claim did not accrue until Pace allegedly sexually harassed Fees between August 2012 and September 2013.  Because Fees's claim accrued less than two years before she filed this matter, her claim is not time-barred.

### B.  Injury

CPI next argues Fees's negligent retention claim fails because she did not suffer an injury cognizable under a negligence theory.  Fees concedes she suffered no physical injury as a result of

Pace's conduct, but argues her claim may proceed because she suffered sexual harassment, which is sufficient under Oregon law.

In support for their argument, CPI cites *Whelan v. Albertson's Inc.*, 129 Or. App. 501, 504 (1994). In *Whelan*, the plaintiff was a security guard employed by an independent-contractor security provider who was assigned to provide security at an Albertson's grocery store. *Id*. Subsequently, the plaintiff was sexually harassed by two Albertson's managers. *Id*. Among his claims, the plaintiff sued Albertson's for negligent retention and supervision of its tortfeasor employees. *Id*. The trial court dismissed the plaintiff's negligent retention claim and the court of appeals affirmed. *Id*. at 504-506. The court observed that the Oregon Supreme Court favorably cited the Restatement (Second) of Torts (the "Restatement") to shape Oregon tort law. *Id*. at 506. Under the Restatement, employers have a duty to "protect the employee from known, imminent danger of serious harm." *Id*. at 507. Thus, an employee is liable where an employee injures the plaintiff "and the employer knew or should have known of the necessity of controlling the employee." *Id*.

However, *Whelan* is not particularly instructive here. First, the court did not conclusively adopt the Restatement as the governing law to be applied in Oregon, as it prefaced its analysis with: "[e]ven if we accept [the Restatement] as law of Oregon plaintiff has not stated a valid basis for imposing liability . . . ." *Id*. Further, the court did not identify the injuries that are actionable under Oregon tort law. Instead, the court addressed only whether the defendant owed a duty to the plaintiff to protect him from sexual harassment by the defendant's employees.

More instructive is *Pearson v. Reynolds School Dist. No. 7*, 998 F. Supp. 2d 1004 (D. Or. 2014). In *Pearson*, the plaintiff sued the defendant for race discrimination, gender discrimination,

"gender harassment," and negligent retention, among other claims.  *Id.* at 1013.  The plaintiff conceded she could not pursue compensation for her physical injuries due to Oregon worker's compensation laws, but argued her emotional injuries were cognizable under a negligent supervision and retention theory.  *Id.*  The court disagreed and held that a person could not recover damages in a negligence claim for emotional damages without accompanying physical damages.  *Id.* at 1031.

The court came to a similar conclusion in *Jernigan v. Alderwoods Grp., Inc.*, 489 F. Supp. 2d 1180 (D. Or. 2007).  There, the court explained:

> Under Oregon law, "a fundamental prerequisite of negligence liability . . . is actual, present harm or injury."  In the negligence context, "'harm' generally refers to physical injury."  Exceptions to the requirement of physical injury in negligence claims include claims for negligent infliction of emotional distress, emotional distress accompanied by physical impact, and negligence for purely economic harm where the harm is predicated on a heightened duty beyond the common-law duty to exercise reasonable care to prevent foreseeable harm.

*Id.* at 1204.  Ultimately, the court held the plaintiff could not recover for non-physical injuries only and granted defendant's motion for summary judgment.  *Id.*

Fees does not contend she suffered physical injury as a result of CPI's negligence, nor does she claim to have suffered economic injury in the context of a special relationship.  Instead she argues that being sexually harassed is a cognizable injury under her negligence claim.  In support, Fees cites *Hayes v. Erickson Air-Crane Co.*, No. 1:12-cv-1369-PA, 2013 WL 3146831, at *5 (D. Or. June 18, 2013).  There, a court in this district denied the defendant's motion for summary judgment on a negligent retention claim because a reasonable juror could find that the plaintiff was sexually harassed and the defendant "could have discovered the harassing behavior with a reasonable investigation."  *Id.*  But the *Hayes* court did not directly analyze the issue of whether sexual harassment, without accompanying physical injury, is a cognizable harm under Oregon

negligence law.  Instead, the court focused its opinion on whether facts existed to allow a reasonable juror to conclude the defendant should have known of its employee's violent proclivity and thus, whether a duty ever arose.  *Id.*

The caselaw demonstrates that in Oregon, a plaintiff may recover for emotional injuries suffered only when those emotional injuries accompany a physical injury.  No physical injury is present here, so Fees' negligence claim fails as a matter of law, and CPI is entitled to summary judgment.

## VI. Intentional Infliction of Emotional Distress

CPI contends Fees's IIED claim fails as a matter of law.  First, it claims that, due to Oregon's two-year statute of limitations, Fees cannot premise her claim on any events which occurred prior to December 2011.  Second, CPI argues that no reasonable jury could find that the events which occurred during the limitations period constitute behavior "outside the realm of socially acceptable conduct" which could give rise to a claim for IIED.  Fees disputes both of CPI's arguments

### A.  Statute of Limitations

Fees's alleges CPI is liable for IIED because it intentionally created or permitted a hostile work environment where CPI employees, Pace in particular, sexually harassed Fees and otherwise engaged in outrageous socially unacceptable conduct.  Fees alleged that Pace's behavior caused her mental and emotional distress including "shame, humiliation, embarrassment, anger, and worry." (Second Am. Compl. ¶¶ 124-126.)  CPI argues that much of the "outrageous" conduct at issue in Fees's IIED claim occurred more than two years before Fees filed this lawsuit.  As a result, CPI contends, Fees's IIED is time-barred in whole or in part.

Claims for IIED are subject to a two-year statute of limitations.  OR. REV. STAT. § 12.110(1).

The court has already discussed *supra* how this two-year statute of limitations applies to bar portions of Fees's negligence claim. Section 12.110 applies identically to Fees's IIED claim, and the court's analysis thus is the same. Because the alleged sexual assault and some alleged harassment occurred prior to December 20, 2011, Fees cannot rely on those actions to prove her claim for IIED.

At oral argument, Fees argued that she may premise her IIED claim in part on the alleged sexual assault in 2008 because she was subject to a continuing violation. Under Oregon law, a "continuing tort is based on the concept that recovery is for the cumulative effect of wrongful behavior, not for discreet elements of that conduct." *Atwood v. Ore. Dep't of Transp.*, No. CV-06-1726-ST, 2008 WL 803020, at *12 (D. Or. March 20, 2008) (quoting *Barrington v. Sandberg*, 164 Or. App. 292, 296 (1999)). The continuing tort may not be used to rely on "discrete acts, which are separately actionable, even though they are connected by the same design or intent." *Atwood*, 2008 WL 803020, at *12. Where a plaintiff suffers actionable harm from each discrete event at issue, the plaintiff may not "ride out the storm and lump sum her grievances" and is not entitled to application of the continuing tort doctrine. *Davis v. Bostick*, 282 Or. 667, 674 (1978).

The court concludes that even if the alleged acts of sexual harassment making up Fees' IIED claim constitute a continuing tort, the alleged sexual assault in 2008 was not part of that pattern of tortious conduct creating the continuing tort. First, the alleged sexual assault and the alleged sexual harassment were not temporally linked by a continuous pattern of tortious events. The alleged sexual assault occurred in 2008, whereas most of the specific events of alleged sexual harassment occurred at conferences and symposia in 2013. The record contains little evidence of specific examples of sexual harassment occurring in the intervening years. Second, the alleged sexual assault was a discreet, stand-alone act which was actionable in and of itself. Under Oregon law,

Fees may not combine that discreet act with a pattern of alleged sexual harassment which began years later.  Therefore, Fees cannot rely on the 2008 sexual assault as part of her IIED claim.

However, most of the conduct on which Fees bases her IIED claim occurred less than two years before she filed this case.  For example, Fees alleges she was sexually harassed by Pace in February, April, July, and September 2013.  She also alleges another CPI employee made sexually suggestive comments in 2013, which contributed to her emotional distress.  Thus, although Fees may not rely on the alleged sexual assault to prove her IIED claim, that claim is not barred in its entirety.

### B.  Merits of Fees's IIED Claim

CPI next argues no reasonable jury could find that CPI is liable for IIED, as the conduct of CPI employees after December 2012 was not beyond the bounds of socially tolerable behavior.  Fees posits that genuine issues of material fact exist, and the court should allow a jury to determine whether her IIED claim has merit.

To prove a claim for IIED, a plaintiff must plead and prove that: "(1) defendant intended to inflict severe emotional distress on plaintiff; (2) defendant's conduct did, in fact, cause plaintiff to suffer severe emotional distress; and (3) defendant's conduct involved some extraordinary transgression of the bounds of socially tolerable conduct." *Lathrope-Olson v. Ore. Dep't of Trasp.*, 128 Or. App. 405, 408 (1994).  To be actionable, the defendant's behavior must be more than merely rude, "insensitive, petty, irritating," or mean, but must "also contain[] some further and more serious aspect." *Clemente v. State*, 227 Or. App. 434, 443 (2009).  Courts have concluded a plaintiff's claim was plausible where an "employer engaged in, or credibly threatened to engage in, unwanted physical contact of a sexual or violent nature." *Id.*  Further, when assessing whether conduct is severe enough to give rise to an IIED claim, the court should look to the context in which the

behavior occurs, and whether there are any "aggravating" factors which increase the severity of conduct that otherwise would not give rise to a claim for IIED *Id.* at 442. For example, courts should look to the relationship between the parties at issue. *Id.* "[C]ourts are more likely to consider behavior outrageous if it is inflicted on the more vulnerable partner in a 'special relationship' such as employer-employee." *Id.* Whether the behavior at issue is beyond the bounds of socially tolerable conduct is a fact-specific inquiry generally left for a jury to decide. *Lathrope-Olson*, 128 Or. App. at 408. However, the court performs a "gatekeeping function" to ensure non-meritorious claims are dismissed prior to trial. *Id.*

In Oregon, sexual harassment can under some circumstances constitute actionable behavior under an IIED theory. In *Lathrope-Olson*, a female employee of the Oregon Department of Transportation was repeatedly subjected to racial epithets, threats, insults, and sexually suggestive comments by one of her fellow employees. 128 Or. App. at 407. While the plaintiff, who was part Native American, was on the work site, one of her co-workers "regularly referred to [plaintiff] as 'squaw,'" told her that "'a squaw was supposed to walk behind her man' and that 'all women were good for was between their legs.'" *Id.* Later, the co-worker threatened to push the plaintiff into the path of oncoming vehicles and "repeatedly locked plaintiff out of the crew van when it was raining or snowing and no other shelter was near." *Id.* The trial court granted defendant summary judgment on the plaintiff's IIED claim, but the appeals court reversed. *Id.* In doing so, the court observed that the co-worker's "overt acts of racism and sexual harassment are not simply rude and boorish, but are more properly characterized as the kind of conduct that a jury could find was intended to inflict deep, stigmatizing and psychic wounds on another person." *Id.*

Similarly, in *Whelan v. Albertsons*, the court analyzed what conduct is necessary to give rise

to an IIED claim.  129 Or. App. at 503-04.  In explaining that sexual harassment may form the basis of an IIED claim, the court quoted Prosser, Torts § 11, which provides, "[t]he invitation to a woman to illicit intercourse, insufficient in itself to be actionable, becomes extreme outrage when it is prolonged and repeated to the point of hounding, and accompanied by advertising in the form of indecent pictures or exposure." *Id.* at 505.  Ultimately, the court determined that, in isolation, much of the behavior alleged would not be actionable, but because it was repetitive and occurred in front of other co-workers and customers, a genuine issue of material fact existed regarding whether the Defendants' conduct was beyond the bounds of socially acceptable behavior.  *Id.*

Here, the court concludes a reasonable jury could find Pace's behavior was an extraordinary transgression of socially acceptable behavior.  Fees cannot directly premise her IIED claim on Pace's actions prior to December 20, 2012.  However, the record shows that, between February 2013 and September 2013, Pace made sexual advances and solicitous comments to Fees each time he saw her, suggesting he would like to "hook up" and "get some time alone."  At an April 2013 conference, Pace declined Fees's invitation to dine with her and several other conference attendees, but told Fees that he wanted to "see her alone" where they could "work on things with [Fees's] hospitals" and "really get down to business."  (Patel Decl. Ex. H at 45.)   These comments could be construed by a reasonable jury as quid pro quo harassment proposing professional advancement in exchange for sexual favors.  In addition, Pace accompanied his sexually suggestive comments with physical touching.  Pace "tickled" Fees's waist, tugged her hair, placed his hands on her shoulders and waist, and put his face close to Fees's neck.  Finally, Oregon law requires that Pace's advances be viewed in the context of their business relationship, where Pace was serving as the direct liaison between CPI and Fees's hospitals.  Here, Pace's sexually suggestive comments were accompanied by the

aggravating factors of Pace's business relationship with Fees and initiation of physical contact.

Based on the repetition and persistence of Pace's comments, coupled with the aggravating factors of physical touching and the parties' business relationship, a reasonable jury could find in Fees's favor on her IIED claim. Therefore, the court should not grant CPI summary judgment on this claim.

## VII.  Motion for Attorney Fees

Finally, CPI moves for attorney fees pursuant to § 12.14 of the Charter Agreement. That section provides:

> 12.14.  Attorneys Fees
>
> The prevailing party in any arbitration, insolvency proceeding, bankruptcy proceeding, suit, or other legal action (other than mediation under Section 12.9) between You and CPI or its Affiliates (a "Legal Proceeding") is entitled to recover its arbitration costs, court costs, and reasonable attorney fees, including investigative costs and attorney fees incurred before commencement of the Legal Proceeding in connection with the matters involved in the Legal Proceeding and costs and attorneys fees incurred on appeal or review from the Legal Proceeding.

"An award of attorneys' fees incurred in a suit based on state substantive law is generally governed by state law." *Lotto Indus., Inc. v. Disabled Am. Veterans Phoenix, Chapter No. 1*, 112 Fed. Appx. 575, 576 (9th Cir. 2004). In Oregon, where the parties to a contract agree to pay the prevailing party's attorney fees in the event of litigation, "the only issue within the trial court's discretion is the amount of attorney fees which is reasonable." *Pelett v. Welch*, 71 Or. App. 761, 763 (1985). However, this Findings and Recommendation does not recommend granting CPI summary judgment in the entirety. Instead, several of Plaintiffs' claims remain, and it is premature to declare CPI the "prevailing party" to this lawsuit. Moreover, neither party briefed the court on which of Plaintiffs' claims are within the scope of Section 12.14 such Defendants' attorney-hours on those claims are

entitled to a fee award.  Finally, CPI did not provide the court with a fee schedule from which an appropriate award could be calculated.  Therefore, the court should deny CPI's motion for attorney fees with leave to raise it again at a later date.

*Conclusion*

For the aforementioned reasons, the court should GRANT IN PART and DENY IN PART CPI's Motion for Summary Judgment (Dkt. No. 126) and DENY CPI's Motion for Attorney Fees with leave to refile. (Dkt. No. 126).  Thus, the court should dismiss with prejudice all of Plaintiffs' claims except their claim for breach of the implied faith of good faith and fair dealing and Fees's claim for IIED.

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due February 19, 2016.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this <u>5th</u> day of February, 2016.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge