UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GROVE CITY VETERINARY SERVICE,
LLC, et al.,

                    Plaintiffs,

          v.

CHARTER PRACTICES, INTERNATIONAL
LLC,

                    Defendant.

3:13-cv-2276-AC

ORDER AND OPINION

ACOSTA, Magistrate Judge:

Defendants move to strike the report of plaintiffs' rebuttal expert, Dr. Randall Green,

Ph.D., which they contend actually is an initial expert report that supports plaintiffs' case-in-

chief.  Plaintiffs assert that Dr. Green's report is a proper rebuttal report that responds to the

reports of defendants' experts, Eric Goranson, M.D., and Donna Wicher, Ph.D.

The court finds that Dr. Green's report is not a proper rebuttal report.  The report is

stricken and plaintiffs may not use it or Dr. Green's testimony for any purpose in this case,

Page 1 - ORDER AND OPINION

including trial.  Because the supplemental expert report submitted by Dr. Roberta Ballard, Ph.D., relies upon and incorporates by reference many of the findings and opinions contained in Dr. Green's report, the court also strikes Dr. Ballard's supplemental expert report to the extent that her supplemental report relies on Dr. Green's report.  Ballard may not testify to those portions of her report, including at trial, and plaintiffs may not use information contained in those portions of the report for any purpose in this case, including trial.

*Background*

Grove City Veterinary Service, LLC, Heather Fees, and Heather Fees, DVM, LLC, ("plaintiffs") filed their lawsuit on December 20, 2013.  Their original complaint included a Title VII claim for sexual harassment based on the alleged conduct of at least two of defendants' "senior, married corporate executives."  (Complaint (ECF No. 1), ¶ 32.)  Plaintiffs asserted a general prayer for "actual, compensatory damages to be determined at trial[.]"  (Complaint, p. 19.)

On July 21, 2014, plaintiffs filed their First Amended Complaint (ECF No. 52.)  This version expanded the original 20-page complaint to 33 pages and added two new plaintiffs: Thomas Baltzell, DVM, and Polaris Veterinary Service, LLC.  This version referred numerous times by name to one of the defendant's senior executives, Aundre Pace, and alleged Pace engaged in sexually harassing conduct toward Fees, "made unwanted sexual advances" toward her, and "forced her to engage in unwanted and unwelcome sexual intercourse with him under the guise of maintaining a 'favorable' continued relationship with [defendant]."  (First Amended Complaint, ¶¶ 63, 65.)  The First Amended Complaint included both detailed descriptions of the

behaviors and conduct Fees alleged Pace committed, and allegations that Pace also deprived her of services in violation of her contract with defendants.  (First Amended Complaint, ¶¶ 63-67, 70, 73, 75, 79-82.)  The First Amended Complaint also added a claim for intentional infliction of emotional distress.  In support of her IIED claim, Fees alleged the sexual harassment and hostile work environment "caused Dr. Fees severe mental and/or emotional distress from the highly foreseeable sexual harassment, causing emotional reactions including, shame, humiliation, embarrassment, anger and worry."  (First Amended Complaint, ¶ 117.)  In her prayer for this claim Fees alleged "actual and compensatory damages for non-economic losses, including physical and emotional injury, pain and suffering, mental anguish, humiliation, embarrassment, and loss of enjoyment of life[.]"  (First Amended Complaint, at 32.)

On October 14, 2014, plaintiffs filed their Second Amended Complaint (ECF No. 64). This version increased the complaint's length by another five pages and added claims for retaliation under Title VII and Oregon law.  (Second Amended Complaint, at 32-33, 34-35.) Fees retained her prior claims for relief, including her claim for intentional infliction of emotional distress.

The history of the court's scheduling deadlines for the parties' expert disclosures is directly relevant to defendant's current motion.  On September 10, 2014, the court entered this minute order:

> MINUTES of Proceedings:   Telephone Discovery/Status Conference held by Judge Acosta.  **ORDER:**
>
> * * * *

> **FURTHER ORDERED:**  Based on the email received from defense counsel on 9/10/14, the court sets a deadline of 12/16/14 for plaintiffs' expert disclosures to be completed, and a deadline of 1/16/15 for defendants' expert disclosures to be completed.

(ECF 59.)

On October 23, 2014, in response to information regarding Fees's health circumstances, the court entered this minute order:

> **MINUTES of Proceedings:**  Telephone Status/Discovery Conference held by Judge Acosta.  **ORDER:**  (1) All depositions are STAYED at this time.  (2) STRIKING the current deadlines as to fact and expert discovery as well as the dispositive motion filing deadline and leaving them open to be reset at a later date.  <u>However, the disclosure of experts is continue[d] on the schedule previously set</u>. . . .

(ECF 69 (underline added).)  Although the court struck all other deadlines, it explicitly left in place the expert witness disclosure process and deadlines in the court's September 10, 2014 scheduling order.

By November 19, 2014, Fees had decided to begin mental health counseling, according to a status report provided by her primary-care physician, Mario Brunicardi, M.D.  On December 12, 2014, plaintiffs submitted a two-page status report from Michaele Barsnack, LPCC-S, which detailed the results of two counseling sessions.  Barsnack included in her letter that "Ms. Fees briefly told of some events that happened to her in work related circumstances including unwanted sexual advancements, 'rape' [said by client][.]"  Barsnack also noted Fees's belief of "being followed and watched by people who were working for the defendant," which included a parking lot confrontation with a stranger that resulted in Fees's week-long hospitalization and

anti-depressant medication treatment, and that Fees remained "most obviously distraught over the workplace trauma[.]"

On December 16, 2014, plaintiffs failed to submit their expert disclosures to defendants, as required by the court's September 10, 2014, scheduling order. On December 17, 2014, the court received this email from one of plaintiffs' lawyers:

> **From:** Himanshu Patel [mailto:HPatel@zarcolaw.com]
> Sent: Wednesday, December 17, 2014 5:08 PM
> **To:** 'Paul_Gale@ord.uscourts.gov'
> Cc: Himanshu Patel; Alaina Siminovsky; Nadia Espinosa; Rick Martson; Caroline Harris Crowne; Ryan Bledsoe; 'judy@jdsnyder.com'
> **Subject: Grove City Veterinary Service, LLC et al v. Charter Practices International, LLC; Case No. 3:13-cv-02276-AC**
>
> Dear Mr. Gale:
>
> On October 23, 2014, the Court held a status conference with the parties to discuss Dr. Fees' condition. The Court entered a stay of all depositions and also struck the fact discovery and expert discovery deadlines to be reset at a later date. [ECF 69] Given a stay of all depositions, the parties have not had an opportunity to hear any testimony from some of the key witnesses in this case as it pertains to the sexual harassment allegations. Further, given Dr. Fees' state of mind, counsel has been unable to coordinate any meaningful dialogue or meeting between Dr. Fees and any potential expert witnesses. Based on this, and given the fact that Plaintiffs intend to retain multiple expert witnesses in this case (in addition to the medical providers that Dr. Fees has seen and which Defendant is already aware of), Plaintiffs respectfully request that the Court re-set the current expert disclosure deadline of December 16, 2014 that will also enable the parties to hear some deposition testimony from crucial witnesses so that the parties can retain the appropriate expert witness(es). Plaintiffs are amenable to discussing new scheduling deadlines, including expert disclosure deadlines, during the January 14, 2015 status conference and/or can make themselves available either this week or next week.
>
> Given the fact that the Court previously struck the fact discovery and expert discovery deadlines, Plaintiffs were under the mistaken assumption that the expert disclosure deadline was in February 2015. [ECF 49]. Based on some e-mail exchanges with Defendant's counsel yesterday and this morning (particularly Mr.

Martson's e-mail on December 16, 2014 at 12:36 p.m. wherein he advised us that 16 – 20 depositions, of which 7 are medical providers and will be among Plaintiffs' expert witnesses in this case), counsel went back and reviewed all pertinent docket entries [ECF 49, 59 and 69] and recognized that while the Court struck the fact and expert discovery deadlines, the Court left the disclosure deadline in place. [ECF 69]. Thus, Plaintiffs are sending this email 1 day after the disclosure deadline. Plaintiffs respectfully submit that they should not be penalized for an honest error. Since no depositions have taken place for about 2 months and the Court does, in fact, intend to issue a new scheduling order, there currently is no nor will there be any prejudice to Defendant. In the alternative, if the Court does not re-set the expert disclosure deadline, Plaintiffs will suffer extreme prejudice.

We look forward to hearing from the Court.

Respectfully submitted,

Himanshu M. Patel, Esq.
Partner
Miami Tower
100 S.E. 2nd Street, Suite 2700
Miami, FL 33131
Telephone: (305) 374-5418
Facsimile: (305) 374-5428
E-mail: hpatel@zarcolaw.com
www.zarcolaw.com

On December 19, 2014, the court sent this response email to all counsel of record:

Dear Counsel:

I have reviewed your respective emails regarding plaintiffs' expert disclosures, which plaintiffs were to serve on defendants on December 16, 2014. The court set the December 16, 2014 date for plaintiffs' expert disclosures during a September 10, 2014 telephone status and discovery conference. The Minute Order of that conference reads in relevant part:

> FURTHER ORDERED: Based on the email received from defense counsel on 9/10/14, the court sets a deadline of 12/16/14 for plaintiffs' expert disclosures to be completed, and a deadline of 1/16/15 for defendants' expert disclosures to be completed.

(Dkt. No. 59.)

On October 23, 2014, the court and the parties discussed at length and in detail the question whether to leave in place the previously set dates for discovery and the parties' expert disclosures, including the December 16, 2014 date for plaintiffs' expert disclosures. This discussion included two of the points Mr. Patel now raises in his December 17, 2014 email as justification for plaintiffs' request to defer, after-the-fact, their December 16 expert disclosures deadline: Dr. Fees's unavailability because of her current condition, and the absence of fact witness testimony through depositions because of the stay of fact discovery. During that discussion the court expressed its intent to keep this case moving forward in those areas that did not critically require Dr. Fees's participation. I note that as of the date of the October 23 telephone and status conference, discovery had stalled with only two or three depositions having been taken, none of those of the plaintiffs, despite that the case was fully ten months old.

At the October 23 telephone status and discovery conference, plaintiffs' counsel, by Mr. Zarco, expressly agreed to leaving in place the parties' expert disclosures, including the December 16, 2014 date for plaintiffs' expert disclosures. This discussion appears on pages 12 through 18 of the 22-page transcript (Dkt. No. 81) of the October 23 hearing. The relevant passages appear at pages 17-18 and read:

> THE COURT: Here's my idea.
>
> *We can leave the current expert report dates in place* but leave open expert discovery pending completion of fact discovery. That way all of you get to know what each other's experts are likely to say on the issues in the case. And if any of them think they need to supplement either with – with the factual record or some additional medical information their reports, you can still do that before you take depositions.
>
> Mr. Martson, what's your thinking?
>
> MR. MARTSON: That's just fine, your Honor. That makes sense.
>
> THE COURT: Mr. Zarco?
>
> MR. ZARCO: *Your Honor, I agree. That makes sense.* I think it would make it sufficient. It would give us flexibility to

adapt in the event the fact testimony turns out to require a little different flavor.

> THE COURT:  All right.  *So I'm going to leave in place the dates for the disclosure of expert reports.*  I'm going to, at this time, leave open the date for the close of fact discovery and the date for the close of expert discovery.  We will set those dates when we have more information about Dr. Fees's condition.

(Italics supplied.)

A minute order followed the October 23, 2014 telephone status and discovery conference.  Minute Order entry (Dkt. No. 69) reads in relevant part:

> **MINUTES of Proceedings:**    Telephone Status/Discovery Conference held by Judge Acosta. ORDER:  (1) All depositions are STAYED at this time.  (2) STRIKING the current deadlines as to fact and expert discovery as well as the dispositive motion filing deadline and leaving them open to be reset at a later date. *However, the disclosure of experts is continue on the schedule previously set.*

(Italics supplied.)

The discussion and the court's ruling at the October 23, 2014 telephone status and discovery conference were completely clear on the scheduling of the parties' expert disclosures.  The Minute Order entered following that conference also was completely clear.  There could have been no confusion by anyone reading the Minute Order, or by anyone present at the telephone status and discovery conference, that the date for disclosure of plaintiffs' expert reports remained December 16, 2014.

I note that plaintiffs had in attendance at the October 23, 2014 telephone status and discovery conference *four* lawyers.  All of them presumably heard the discussion and my ruling on the expert disclosure dates.  None of them, however, appears to have made note of my ruling.  Further, one of plaintiffs' lawyers, Mr. Zarco, expressly and unequivocally agreed both to leaving in place the plaintiffs' and defendants' respective expert report disclosure dates, as well as with the court's rationale for doing so.  Now, for reasons not explained, Mr. Patel's email relies for a retroactive postponement of the plaintiffs' expert disclosures using the very same points the court concluded and Mr. Zarco conceded were not sufficient to cause a reset of the expert disclosure dates.

Thus it is unclear, on this irrefutable record, how all of plaintiffs' four lawyers could have committed "an honest error" in misunderstanding the court's October 23, 2014 order regarding the dates for expert disclosures, especially when one of those lawyers explicitly agreed with the court's order. Instead, this most recent situation seems one in a pattern of actions by plaintiffs' counsel in this case which, at best, demonstrates ambivalence toward this court's orders and, at worst, displays a lack of respect for the court's prerogative under the rules to issue orders to establish schedules and resolve the parties' discovery disputes. I have previously expressed my dismay at plaintiffs' counsels' decisions to ignore two of this court's prior orders. (*See, e.g.*, Transcript of September 17, 2014 hearing (Dkt. No. 60), at 17-18.)

Good cause for plaintiffs failing to make their expert disclosures has not been demonstrated under FRCP 16(b)(4). The court has discretion to issue sanctions for violations of its scheduling orders. FRCP 16(f)(1)©. At time I will defer imposition of sanctions, subject to the contingency stated in the following paragraph. Instead, I hereby **ORDER** plaintiffs to disclose their experts to defendants no later than Monday, January 12, 2015. "Disclosure" means providing to defendants the reports required under Federal Rule of Civil Procedure 26(a)(2). For purposes of expert disclosure, plaintiffs must comply with the requirements of *Goodman v. Staples the Office Superstore LLC*, 644 F.3d 817 (9th Cir. 2011).

Although I have deferred imposing sanctions at this time, I note that plaintiffs' failure to comply with the January 12, 2015 deadline will result in sanctions. Sanctions will include being precluded from offering expert testimony, including at trial. Further, any failure to provide an expert report for any treating doctor whose testimony plaintiffs subsequently offer, by affidavit, declaration, at trial, or in any other manner, that is based on information not acquired during that doctor's treatment of the plaintiffs in this case or opines on causation without sufficient evidence in that doctor's treatment records of such opinion will result in sanctions. Sanctions will include the exclusion of that treating doctor's testimony, in whole or in part, as appropriate, except for testimony regarding information and opinions obtained by those doctors during their treatment of plaintiffs.

**FURTHER ORDERED** that Defendants' expert disclosures must be provided to plaintiffs on Thursday, February 12, 2015.

An appropriate minute order regarding expert disclosures will be entered in the case docket.

Regards,

**Hon. John V. Acosta**
United States Magistrate Judge
District of Oregon
1127 U.S. Courthouse
1000 S.W. Third Avenue
Portland, Oregon  97204-2944
Phone:  (503) 326-8280 | Fax:  (503) 326-8289
Email:  John_Acosta@ord.uscourts.gov

(ECF No. 86.)

Because plaintiffs had failed without good cause to meet the court's deadline for their

expert disclosures, Rule 16(f)(1)(C) empowered the court to impose sanctions for that non-

compliance.   The court deferred doing so, however, pending plaintiffs' demonstrating

compliance with the court's new disclosure deadline and the remaining expert disclosure

deadlines.   The court explicitly stated that it would impose preclusive sanctions if plaintiffs

failed to meet the new date, January 12, 2015, for disclosure of their experts.   To ensure clarity,

on December 22, 2014, the court issued this minute order memorializing its December 19, 2014

email ruling:

> **ORDER by Judge Acosta:**  The court has reviewed the parties' respective emails
> regarding the December 16, 2014 deadline for plaintiff's expert disclosures.  The
> court finds plaintiffs have failed to demonstrate good cause under FRCP 16(b)(4)
> for not submitting their expert disclosures to defendants by the December 16,
> 2014 deadline.  The court exercises its discretion to defer at this time issuing
> sanctions under FRCP 16(f)(1)(C) for violation of its prior scheduling order, as
> stated and under the conditions described in the court's December 19, 2014 email
> to counsel.  The court hereby ORDERS plaintiffs to disclose their experts to
> defendants no later than Monday, January 12, 2015.   "Disclosure" means
> providing to defendants the reports required under Federal Rule of Civil
> Procedure 26(a)(2).  For purposes of expert disclosure, plaintiffs must comply
> with the requirements of *Goodman v. Staples the Office Superstore LLC*, 644 F.3d

817 (9th Cir. 2011).  Failure to comply with the January 12, 2015 deadline will
result in sanctions, including exclusion of expert evidence and testimony.

> **FURTHER ORDERED** that Defendants' expert disclosures must be provided to
> plaintiffs no later than Thursday, February 12, 2015.  (3-page letter sent by judge
> Acosta to counsel by email attached)(peg) (Entered: 12/22/2014)

(ECF 86.)

The very next day, December 23, 2014, one of the attorneys for plaintiffs contacted
Barsnack to gather Fees's medical records.  (ECF No. 193-5, at 2.)  Barsnack noted in her file
that plaintiffs' attorney said Fees's records "will be sent to a trauma specialist who will assess
them." (*Id.*)  Barsnack noted later on the same day that Fees herself contacted Barsnack's office
to get her records to give to her lawyers, "w/the understanding it will go to a specialist who will
assess her trauma." (*Id.*)  These contacts demonstrate that no later than December 23, 2014,
plaintiffs knew a trauma specialist would be needed to prove Fees's emotional injuries as a
necessary component of their case-in-chief.

On January 9, 2015, Barsnack submitted her second status report letter to update Fees's
treatment and progress.  Barsnack summarized two more sessions with Fees and noted in
particular Fees's consistent "re-counting" of the "occurrences, with her employer, that caused
great distress and that continues to cause distress."  These occurrences included the sexual
assault and sexual harassment "named in her lawsuit."  Barsnack concluded:  "Ms. Heather Fees
is experiencing great emotional distress over the work related events that are named in her
lawsuit."

On January 12, 2015, plaintiffs disclosed their experts:

1. Michaele Barsnack

Page 11 - ORDER AND OPINION

2. Dr. Mario Brunicardi

3. Dr. Geoffrey Fortner

4. Dr. Paul Taraska

5. Dr. Jerry Sheward

6. Paul Ludes-Braeger, LSCW

7. Debra Posthumus, R.N.

8. Carrie Chapman, R.N.

9. Leanne Rusin, MHC

10. Dr. Roberta Ballard, Ph.D.

(ECF No. 193-7, at 1-4.)  Plaintiffs characterized all but one of the disclosed experts as "Dr.

Heather Fees' medical providers."  (*Id.* at 2.)  Plaintiffs stated that one of those providers,

Michaele Barsnack, LLPC (Licensed Professional Clinical Counselor),

> [I]s expected to present evidence regarding the mental health clinical counseling
> and emotional stabilization and support that she has been providing to Dr. Fees
> since November 2014, as reflected in the documents bates-numbered FEES
> 005734-5; FEES 005736-47; FEES 005748-49; FEES 006044-46; and FEES
> 006047-49.  She has diagnosed Dr. Fees as suffering from post-traumatic stress
> disorder.  Ms. Barsnack is expected to testify regarding her diagnosis and
> assessments of Dr. Fees' mental and emotional trauma resulting from the reported
> sexual harassment and sexual assault by a male superior in the workplace and the
> continued distress and emotional distress that such experience has caused Dr.
> Fees.  Ms. Barnack is generally expected to conclude that Dr. Fees has
> experienced and continues to experience great distress and trauma over the
> workplace sexual harassment and sexual assault.

(ECF No. 193-7, at 3.)  As to the other provider, Mario Brunicardi, M.D., plaintiffs stated:

> Dr. Brunicardi is expected to opine on his observations, diagnosis and treatment
> recommendations for Dr. Fees as reflected in the documents bates-numbered
> FEES 005701-005733 and FEES 005771-5800.  He is expected to testify that Dr.

Page 12 - ORDER AND OPINION

> Fees' treatment commenced in July 2014 when Dr. Fees entered his care as a new patient with a sinus infection. Dr. Brunicardi is expected to testify that on or about October 16, 2014, Dr. Fees had a panic attack and reported allegations of sexual assault in the work place, for which she had received counseling. Dr. Brunicardi will testify that as a result of Dr. Fees' reported allegations of sexual trauma, Dr. Brunicardi concluded that Dr. Fees was experiencing post-traumatic stress disorder and prescribed TraZODONE and Fluvoxamine. Dr. Brunicardi will also testify that he prescribed Seroquil for Dr. Fees following her release from Community Health Hospital, where she was hospitalized for several days, based on the treatment she received at Community Health Hospital. Dr. Brunicardi is expected to testify that his diagnosis of Bipolar affective disorder was educated by medical records obtained from Community Health Hospital.

(ECF No. 193-7, at 3-4.) For the other seven treating health care providers plaintiffs supplied a single-sentence description: "The treating practitioners indicated above are expected to opine on their observations, diagnosis and treatment recommendations for Dr. Fees following a psychotic episode in October 2014 for which she was hospitalized at Community Hospital of Indiana." (*Id.* at 4.)

Ballard, a psychologist, was the only retained expert included in plaintiffs' initial expert disclosures, and plaintiffs' description of Ballard's expected testimony consisted of referring to her report which plaintiffs attached to their disclosures. (*Id.* at 2.) Ballard's January 11, 2015 report comprised seven pages; half of that length consisting of the descriptions of her expertise and qualifications, listings of the selected litigation documents and medical records she reviewed, titles of the reference materials she relied upon, and an explanation of the "methods and procedures" she used in forming her opinion – methods and procedures which, Ballard expressly stated, did not include examining, meeting with, or talking to Fees. (*Id.* at 7-10.)

The remaining three and one-half pages of Ballard's report contain four opinions, none of which assess Fees's "trauma," discuss the alleged rape, or link Fees's emotional injuries to the

sexual assault and harassment allegations contained in her complaints. Ballard's first three

opinions and their respective "Foundations" focus on explaining Fees's actions following the

alleged rape:

> 1. There existed an explicit power differential at Dr. Fees [sic] place of work
> between herself and the individuals who allegedly harassed her.
>
> 2. That Dr. Fees did not immediately confront Mr. Pace and/or immediately
> institute a written complaint regarding Mr. Pace's behavior is consistent with
> common victim behavior.
>
> 3. That Dr. Fees reported the harassment to CPI's Legal Counsel, Bruce G.
> Berning, Esq., rather than making a written report, is consistent with common
> victim behavior.

(*Id.* at 10-12.) Ballard's fourth opinion addresses Fees's emotional state but only as it developed

in response to her having reported the sexual assault and harassment to defendant:

> 4. Dr. Fees' occupational and psychological situation has worsened since
> reporting the sexual harassment, and this is consistent with research on victims of
> sexual harassment.

*(Id.* at 12-13.)

Ballard's curriculum vita shows her practice has emphasized criminal and civil forensic

psychological evaluations, with particular emphasis on competency, sanity, sentencing, parental

capacity, medical malpractice, and personal injury evaluations, and "individual outpatient

therapy with adult[s] and adolescents, with a specialty in depression, anxiety, and trauma." (*Id.*

at 14-15.) Ballard, however, never addressed Fees's trauma or its cause, and she never discussed

Pace in that context. Rather, she focused only on theories of "power differential" and "common

victim behavior" as those theories might apply to provide context for various aspects of Fees's

circumstances and behavior after she reported the alleged rape. From plaintiffs' initial expert

Page 14 - ORDER AND OPINION

disclosures, then, it is clear they intended to rely on Fees's primary-care doctor, Brunicardi, and her treating counselor, Barsnack, to establish different pieces of Fees's emotional damages claims, and the descriptions of Brunicardi's and Barsnack's expected testimony implicitly acknowledge Fees's case-in-chief burden to prove her emotional injuries.

On January 15, 2015, the court held a telephone status conference, at which it lifted the discovery stay and reaffirmed the February 12, 2015 deadline for defendant's expert disclosures. (ECF No. 89.)  During this status conference plaintiffs' attorney stated:

> And then in terms of experts, Mr. Martson indicated to us earlier this week or last week that they may hire an expert to do a mental examination of Dr. Fees. Assuming that's the case, then we're going to have to hire a rebuttal expert for that.  And then we obviously have Dr. Ballard, who we've hired as an expert already, who tendered her expert report.  So we're looking at probably two expert depositions.

(Transcript of January 15, 2015 status conference (ECF No. 98), 9:10-14.)  This statement, coupled with plaintiffs' expert disclosures, establishes that three days after the deadline for their initial expert disclosures, plaintiffs had yet to retain an independent expert to examine Fees, determine the presence of one or more mental health conditions and emotional injuries, and link those conditions and injuries to the events alleged in plaintiffs' complaint.

By the January 29, 2015 deposition scheduling conference, defendant had requested an IME.  (ECF No. 92.)  At that conference the court extended the February 12, 2015 deadline for defendant's initial expert disclosures to allow defendant's expert psychiatrist and expert psychologist to perform their IME of Fees.  (*Id.*)  Defendant was to serve those experts' reports within fourteen days of the completion of Fees's IME.  (*Id.*)

Plaintiffs deposed Pace on March 1, 2015.

Page 15 - ORDER AND OPINION

On May 19, 2015, defendant deposed Barsnack (ECF No. 209-1, at 1), and on May 21, defendant deposed Brunicardi (ECF No. 209-2, at 1). In her deposition testimony Barsnack denied serving as an expert for Fees. When asked whether plaintiffs had asked her "to provide expert testimony in this case," Barsnack replied "No." (ECF No. 209-1, at 6-7.) Barsnack made additional disclaimers about her expertise and ability to provide expert testimony regarding Fees's conditions. (*Id*. at 7-9.) When asked whether she would "feel comfortable providing expert testimony given [her] ethical duties and not having the full picture," Barsnack answered "No." (*Id*. at 9.)

Two days later, Brunicardi gave similar testimony in his deposition. When asked about Fees's allegation that she suffered from PTSD, Brunicardi replied "I don't feel qualified to give somebody a concrete diagnosis of posttraumatic stress. . . . I think that needs to come from a psychiatrist." (ECF No. 209-2, at 4-5.) He also testified: "I consider myself an expert in general family medicine but not specifically to mental illness" and "I don't think I'm an expert in mental health conditions." (*Id*. at 7, 8.) In fact, Brunicardi opined that any diagnosis of PTSD, bipolar disorder, and schizophrenia "needs to come from a psychiatrist." (*Id*. at 5.)

Fees's IME occurred on June 8, 2015.

On June 22, 2015, defendant served the IME reports of its two experts, Dr. Eric Goranson, M.D., and Donna Wicher, Ph.D. Both experts personally examined Fees. Goranson prepared a 21-page report and Wicher prepared a 14-page report, and attachments accompanied both reports in which each expert provided an extensive list of the documents reviewed in preparation of their respective opinions, which included the depositions of Fees, Fees's health

care providers, and other witnesses; Fees's medical records dating from 1995; plaintiffs' expert

designations and reports; the transcript of Fees's October 2014 911 call; and printed versions of

the text messages exchanged between Fees and Pace.

Goranson devotes nearly the entirety of his 21-page report to his examination of Fees and

his findings.  Ten pages of his report contain a thorough history, both past and recent, ten pages

contain his detailed assessment of Fees's claimed and actual conditions, and the final page of his

report contains his succinct diagnoses.  Goranson uses less than one page to identify the

documents and records he reviewed to prepare his report, choosing instead to list each reviewed

document and record in an eight-page appendix accompanying his report and to supply the

printed lab reports of the tests he ordered in an additional six pages.

Goranson describes Fees's presentation at the exam and her explanation of the purpose of

the exam:

> I asked Dr. Fees to tell me what this examination was about.  She told me she was
> not supposed to discuss the lawsuit.  She told me it was confidential, but that it
> was about sexual harassment, breach of contract, and retaliation. When I asked
> her more specifically, she said "I was raped by my boss who continued to
> sexually harass me for years.  I reported it a couple of weeks after the event to [an
> attorney for defendant]."  She told me that nothing had been done about what she
> reported.

(ECF No. 193-8, at 5.)  Goranson covers Fees's living circumstances and current treatment,

hobbies and activities, and work routine.  He documents Fees's description of her past and

current use of alcohol and marijuana.  He details Fees's personal history, beginning with her

family life; progressing through high school, college, and veterinary school; and the problems

she experienced during her marriage, including "fights" that prompted "on a couple of occasions

the police" being called.  (*Id.* at 7.)  He provides Fees's self-assessment of her current symptoms. Goranson also ordered multiple lab tests to obtain objective information about Fees's alcohol and marijuana use.

Goranson extensively documents Fees's account of her interactions with Pace, including the alleged rape and Pace's conduct, and their effect on her.  Under "Past History," he notes Fees's descriptions of her relationships with other men, several of whom she alleges were defendant's executives or employees at the time, and one of whom allegedly raped her in 2004 and sometime later attempted to rape her again.  (*Id.* at 11-13.)

In the "Assessment" section of his report, Goranson lists his findings:

1. Primary Diagnosis:  Substance Abuse.

2. Secondary Diagnosis: Borderline Personality Disorder.

3. Bipolar Disorder as a Possible Diagnosis is Debatable.

4. Post-Traumatic Stress Disorder ("PTSD") is Not Supported.

(*Id.* at 14-21.)  Goranson explains the basis for each finding and, as applicable, the cause of each condition he concludes exists.  Particularly relevant is his "Opinion, Foundation, and Effect" narrative for his Borderline Personality Disorder assessment:

2. *Secondary Diagnosis: Borderline Personality Disorder*

a. Opinions, Foundation, and Effect

Although her primary diagnosis is alcohol and marijuana abuse and dependence, there is an underlying significant personality disorder with borderline narcissistic and histrionic features, categorized as Axis II Cluster B.  Dr. Fees has been described by others as being gregarious, liking to be the center of attention and being very social (a histrionic trait).  She reportedly has treated her employees in

a dismissive manner and she has been reported to have had explosive angry outbursts at her employees (a narcissistic trait).

Borderline personality has been described as "the great imitator," in that these patients typically present with symptoms that masquerade as other psychiatric disorders such as panic disorder, OCD, eating disorder, depression, anxiety, etc., only to have the true pathology emerge in the context of therapy. Dr. Fees has had a number of diagnoses throughout her life, including eating disorder, anxiety disorder, adjustment disorder, and bipolar disorder. All of this is consistent with the diagnosis of borderline personality disorder, based on my 35 years of experience. In DSM-V the diagnosis of borderline personality disorder requires the satisfaction of five different criteria from among the following:

> • The first relates to efforts to avoid abandonment. With respect to Dr. Fees, this is suggested by her multiple affairs with men as well as Dr. Sansotta's report that Dr. Fees "seeks emotional support through relationships with men." From my review of records, it appears that Dr. Fees had consensual sex with at least six different men over the past several years, including after the alleged rape by Mr. Pace. She had an extended affair with Barry Goldberg which included going on a cruise, two trips to China as well as going to symposia with him, and "consensual sex," according to Dr. Fees.

> • A second criterion is "a pattern of unstable and intense personal relationships characterized by extremes of idealization and devaluation." Although complicated by her alcohol and marijuana use, her multiple affairs both while married and after the divorce are suggestive of this.

(ECF No. 193-8, at 15-16.)

Goranson concludes his report with a "Diagnoses" section:

Axis I:    1. Polysubstance Abuse and Dependence (alcohol and marijuana).
            2. Rule Out Bipolar Disorder.
            3. Does not have Post-traumatic Stress Disorder.

Axis II:    Mixed Personality Disorder with Borderline, Narcissistic and Histrionic Factures.

Axis III:    No relevant psychiatric diagnosis: asthma; Fibronodular Hyperplasia of the liver; two C-sections.

Axis IV:       Severity of Psychosocial Stressors – currently moderate (this is primarily a result of anxiety arising out of the process of the lawsuit, which is different than having anxiety related to the alleged incident with Mr. Pace).

Axis V:        GAF score = 80 to 85.

(*Id.* at 23.)

Wicher's 14-page report is similarly devoted almost entirely to her examination and findings. The first two paragraphs contain a statement of the purpose of her examination: "to determine whether Dr. Fees is presently suffering from a diagnosable mental or nervous disorder and, if so, its relationship, if any, to an alleged rape and subsequent sexual harassment by her regional vice-president, Aundre Pace, and his company." (ECF No. 193-8, at 46.) Also included are lists of the tests she conducted and the materials she reviewed, although Wicher, as did Goranson, relegated to appendices the comprehensive description of the documents and records she reviewed.

Under "Present Injury" Wicher notes "Dr. Fees claims that she was raped and sexually harassed by her regional vice-president, Aundre Pace, starting with the alleged rape, which she states occurred on November 2, 2008." (*Id.*) The next three pages contain Fees's description of her encounters with Pace and their effect on her. Under "Chief Complaints" Wicher's entry reads: "Dr. Fees complained of a constant level of anxiety. . . . She stated that, in her mind, she relives the rape and subsequent sexual harassment." (*Id.* at 50.) Wicher describes under "Current Treatment" Fees's report that she sees Dr. Hawke and Ms. Barsnack "about once a month," takes 450 mgs of Seroquel nightly, engages in "relaxation modalities" such as yoga, and

that she "smokes marijuana with variable frequency" because it "helps reduce her anxiety." (*Id.* at 50.)

Under "Past Medical History" Wicher lists Fees's previous mental health treatment. Wicher identifies a succession of providers beginning in 2004 and extending to 2007, during which period Fees sought treatment for stress related to her marriage and problems with her relationship with her brother, and received at least one course of prescription medication. (*Id.* at 50.) Wicher also includes a page-long section entitled "Social History," in which she summarizes Fees's family background, marriage, and relationships with other men following her divorce. (*Id.* at 51.) The "Mental Status Evaluation" section of Wicher's report includes a brief summary of Fees's current daily activities and a longer description of her alcohol use. (*Id.* at 51-53.)

In her "Diagnosis" section, Wicher states:

The following are the DSM-5 diagnoses for Dr. Fees:

Rule/out 296.80 Unspecified Bipolar and Related Disorder.

301.83 Borderline Personality Disorder.

Polysubstance abuse, presently using alcohol and marijuana.

Allergies.

(*Id.*, at 54.)  The five-page "Discussion" section of Wicher's report includes with observations which paralleled those Goranson made in his report:

"Although she attributes her current psychological symptoms to the alleged rape and sexual harassment by her regional vice-president, the results of the current evaluation indicate that pre-existing and unrelated personality features and other psychological factors are causing her current symptoms."

\* \* \* \*

"Dr. Fees has a number of pre-existing psychological conditions that include Borderline Personality Disorder, possible Bipolar Disorder, and a polysubstance abuse disorder."

\* \* \* \*

"Clearly, she has a past history of mental health issues that have continued to be present throughout her life."  "  (ECF No. 193-8, at 54-56.)

Wicher states that Fees does not have PTSD or "a diagnosable mental or nervous disorder caused by the alleged rape and sexual harassment."  (*Id.* at 54.)  In partial support, Wicher cites Fees's description of her behavior, both immediately following the alleged rape and in the months following the incident, of initiating interactions with Pace and resuming her pre-incident pattern of "having multiple sexual contacts."  (*Id.* at 54.)  Wicher discusses in detail how the testing results do not support a diagnosis of PTSD, explains how the testing and examination data support a diagnosis of borderline personality disorder, and assesses the probability that preexisting conditions account for Fees's current conditions.  (*Id.* at 55-57.)  Wicher uses the next two pages of her report to discuss Ballard's specific findings and identify the inconsistencies between Ballard's conclusions and the information in Fees's history which demonstrate conditions preexisting the alleged rape.  (*Id.* at 57-59.)

Wicher concludes her report with the opinion that preexisting conditions, not the alleged rape and harassment, are the source of Fees's current problems:

> In summary, Dr. Fees has pre-existing psychological difficulties that continue to the present time but, while she has these pre-existing difficulties, her overall level of functioning did not change in any noticeable way after the alleged rape and sexual harassment, and she has continued to operate her hospitals and parent her children until very recently.  She appears to regard herself as an individual who

> was well-adjusted prior to the alleged incident who is now impaired from that
> event, and she does not recognize that the impairment, to the degree that she has
> any, was present before.   This stance is well-documented in the research
> literature, such as "Forgetting, Fabricating, and Telescoping, The Instability of
> the Medical History", by Arthur J. Barsky, M.D., in Archives of Internal
> Medicine, 2002; 162: 981-984, showing that patients typically present histories
> that minimize prior conditions and attribute all of their current symptoms to more
> recent events.

(*Id.* at 59.)

On June 22, 2015, defendant served both Goranson's report and Wicher's report on plaintiffs.

On July 29, 2015, the court held a discovery conference by phone to resolve the parties' confusion over the court's prior order pertaining to filing supplemental and rebuttal expert reports.   The court set a deadline for submitting supplemental expert reports, to follow the depositions of Fees's two remaining treating doctors.   During the conference, defendant's attorney stated:

> I will say, Your Honor, just so the Court understands any hesitancy that
> appears in my voice or the voice of my partners here, that there's no need to take
> on the substance of this at this point, but we anticipate and expect that what the
> plaintiffs will file under the guise of a rebuttal report really will be a report which
> was foreseeable at the time they filed their first report.
>
> Now, what they did first was file a report by Dr. Ballard, a psychologist,
> who just did a records review.  We, as the Court knows, asked for an IME of Dr.
> Fees.  We had that in June, and we prepared – we had our expert prepare reports
> based on their record review and the IME.
>
> In the course of discovery, we found documents from one of Dr. Fees's
> treating physicians, indicating that she was going to go to Portland after our IME
> for an in-person examination herself, with presumably experts that the plaintiffs
> had hired.

So what we're mainly concerned about is less on the dates and more on the fact that what we are anticipating at this stage regarding experts is that the plaintiffs may, in effect, seek to turn the Court's scheduling orders on its head and have us having to file the real expert report first and then they file a report under the guise of a rebuttal report which they could very well have done initially as the primary expert report.

* * * *

THE COURT:  All right.  So – and you're right, we don't need to and we won't get into the substance  of whether a report is truly a rebuttal report or a primary report.  This issue comes up from time to time in expert disclosures in cases.  But with respect to timing, what you anticipate is seeing a report from a new doctor that purports to respond to the IME reports but is really a primary report, correct?

MR. MARTSON:  That's correct in a nutshell, Your Honor.

(Transcript of July 29, 2015 proceedings (ECF No. 188), at 6-8.)

On August 30 and 31, 2015, Dr. Randall Green, M.D., plaintiff's designated rebuttal expert, examined Fees for a total of fourteen hours.  Green also administered five diagnostic tests to Fees, including the MMPI.  In addition, Green spent two hours interviewing Fees's mother and sister.

On September 28, 2015, Green issued his expert rebuttal report.  Green's rebuttal report is 60 pages in length and is accompanied by almost 20 pages of attachments.  One attachment is Green's curriculum vita, which, "Professional Experience," reads in relevant part:

August, 1986 - Present

CLINICAL PSYCHOLOGIST, Private Practice, Salem, Oregon

Conduct general clinical practice of assessment, treatment and consultation. . . . Expert witness in forensic work and consultation in criminal and civil litigation.

Clientele span a wide range of ages from children to adults.  <u>Treat diagnostic problems which include</u> sexual deviancy, <u>victim/trauma recovery</u>, co-dependency, "adult child" syndromes, <u>anxiety, depression</u>, schizophrenia, <u>paranoia, non-chemical addictions</u>, eating, and <u>personality disorders</u> as well as disorders of childhood.  Utilize individual, marital, family and group therapy modalities.

(ECF No. 193-9, at 64 (underline added).)   Green's CV also notes, under "Professional Organizations," that he is a member of both "The American Academy of Experts in Traumatic Stress (Clinical member: 1995), and the International Society for Traumatic Stress Studies (Clinical member since 1995).   (*Id*. at 68.)   Under "Continuing Education," the following relevant entries appear:

**2012**

| | |
|---|---|
| Trauma, Addiction & Grief:  Proven, Practical Treatment Plans | 6.0 hours |

**2011**

| | |
|---|---|
| Treating Trauma and Addiction | 6.0 hours |

**2009**

| | |
|---|---|
| Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions (Workshop Part I) | 7.0 hours |
| Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions (Workshop Part II) | 7.0 hours |
| Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions (Part III) | 7.0 hours |
| Psychological Trauma:  Neuroscience, Attachment, and Therapeutic Interventions (Part IV) | 3.5 hours |

**2007**

| | |
|---|---|
| Psychophysiological & Emotional Effects of Avoidant Coping In Diverse Samples of Trauma Survivors | 1.25 hour |

**2006**

Page 25 - ORDER AND OPINION

| | |
|---|---|
| Trauma-related Cognitions among Assault Survivors with PTSD Symptoms | 1.25 hour |
| Impact of Prior Trauma History of Psychobiological Reactions to Subsequent Trauma and PTSD Risk | 1.25 hour |
| Transitional approaches to the Study of Resilience: Implications for Recovering from Traumatic Stress - A Defining& Operationalizing Resilience | 1.25 hour |
| Cognitive Affective Bases of Resilience to Stress & Trauma | 1.25 hour |
| Responding to the Clinical Complexity of Trauma-Treatment Response to Adults:  What do we know and how can we best apply it to the full range of clinical presentations? | 1.25 hour |
| Translational approaches to the Study of Resilience: Implications For Recovering from Traumatic Stress - Roundtable discussion | 1.25 hour |
| Who Develops PTSD and Who Doesn't: Early Predictors Across Trauma Populations | 1.25 hour |

**2005**

| | |
|---|---|
| Oregon Psychological Association - 2005 Conference How We Recover from Trauma [with other seminars] | 13.0 |

**2003**

| | |
|---|---|
| Post-Traumatic Stress Dishonesty [with other seminars] | 5.0 hours |

**2002**

| | |
|---|---|
| Not Just PTSD:  The Complexity of Post-Traumatic States | 3.0 hours |
| The Psychobiology of Post-Traumatic Stress | 3.0 hours |
| Frontiers of Trauma Treatment | 7.0 hours |

(*Id.* at 73-75.)  Green's continuing education list shows during this same period multiple entries

related to other PTSD, personality disorder, and bi-polar disorder seminars.  (*Id.*)

On the first page of his report, under "Reason for Referral,", Green states:

> Plaintiffs' counsel has asked me to review the expert report submitted by Dr. Eric Goranson and Dr. Donna Wicher and conduct my own independent forensic psychological examination of their client, Heather M. Fees, D.V.M. in response to same.

Dr. Fees is a plaintiff in a civil lawsuit against Charter Practices International (CPI). Dr. Fees, a licensed veterinarian, operates three pet hospitals pursuant to three Charter Practice Agreements, the first of which was signed in approximately 2000.

The Second Amended Complaint ("Complaint") alleges that Dr. Fees had been subjected to unwanted sexual harassment by multiple corporate executives of CPI, the most egregious act occurring on November 2, 2008 and continuing thereafter through the filing of the lawsuit. She alleges that she was sexually harassed and ". . . forced to engage in unwanted and unwelcome sexual intercourse with (Aundre Pace, Regional Vice President) under the guise of maintaining a 'favorable' and continuing relationship with CPI . . ."

The Complaint alleges ongoing actions consistent with sexual harassment by Mr. Pace. It alleges that Dr. Fees believed her ongoing business ties with CPI were conditioned upon having [the] personal relationships with senior executives who were influential in the decision about an owner's continued affiliation with CPI.

(ECF No. 193-9, at 1-2.)

After listing the interviews and tests conducted, Green provides a comprehensive and lengthy background of Fees. He covers Fees's physical appearance and affect during the interview, the findings from his "brief mental status examination," her family history, her personal history from birth through college, her relationships with her siblings, her "abuse history," her medical history, her "sexual development and relationship" history, her alcohol and drug history prior to the November 2008 incident, her mental health treatment history prior to the November 2008 incident, and the November 2008 incident itself. (*Id.* at 5-19.) Green then describes Fees's actions and experiences following the November 2008 incident, including an extensive description of her conversation with defendant's general counsel about the alleged rape, her use of drugs and alcohol, her mental health treatment, the October 2014 parking lot altercation, her business relationship with defendant, "other significant developments," and the

litigation.  (*Id.* at 21-34.)  Green devotes another six pages of his report to Fees's week-long crisis center hospitalization following the October 2014 parking lot altercation, and to a description of her mental health treatment following her discharge.  (*Id.* at 34-40.)

Most notable is the space Green dedicates to discussing, analyzing, and referencing Pace. Green details Pace's account of the November 2008 incident, sets out Fees's and Pace's respective descriptions of their interactions in the months following the incident, compares the differences between Fees's and Pace's respective testimony about the November 2008 incident and their subsequent interactions, comments on Pace's credibility, and speculates about his motives for various behaviors and comments; Green also explains the significance of Pace's conduct in contributing to Fees's current condition.  (ECF No. 193-9, at 19-21; 22; 24; 25-29; 32; 33; 34; 37; 38 (attributing her "exhaustion to 'rehashing the content of the rape' "); 47-48; 49-50; 51; 56-58; 59; 60.)

Green describes and documents the five mental health diagnostic tests, accompanied by an explanation of their usefulness to his evaluation of Fees's condition:

1.  The Minnesota Multiphasic Personality Inventory-2 ("MMPI"), a standardized personality test composed of 567 items that compares the subject's response patterns to those of various normative clinical and non-clinical populations.

2.  The Millon Clinical MultiaxialInventory-111, a personality test that provides a measure of twenty-four disorders and clinical symptoms of adults who are undergoing either assessment or treatment.

3.  The Trauma Symptom Inventorv-2, a 136-item test exploring the presence of symptoms consistent with posttraumatic stress and other psychological sequelae of traumatic events that have been experienced in the past six months by the subject.

4. The PTSD Screening and Diagnostic Scale ("PSDS"), which assesses the six DSM-IV criteria relevant to diagnosing PTSD.

> 5.   The Detailed Assessment of Posttraumatic Stress ("DAPS"), a 104-item assessment intended to assess the degree to which PTSD symptoms are reported to be present with an individual in the thirty days immediately preceding the test, and the degree to which the subject over- or under-responded to the items with regard to test-taking styles (validity scales).

(*Id.* at 40-45.)   Green follows this section of his report with a seven-page section entitled "Summary of information reviewed in this rebuttal evaluation," prefaced by the statement "The clinical interview, collateral contacts, tests, and files that were reviewed support the following summary, stated to a reasonable degree of psychological probability[.]"  (*Id.* at 45-52.)

Green concludes his report with two sections.   First, a section entitled "Diagnostic Impressions":

| | |
|---|---|
| 298.8//F23 | Status Post Brief Psychotic Disorder, with marked stressors |
| 300.03/F41.1 | Generalized Anxiety Disorder |
| 301.89/F60.89 | Other Specified Personality Disorder, with Histrionic and Narcissistic Features |
| 309.89/F43.8 | Other Specified Trauma-and Stressor-Related Disorder |
| V62.29/Z56.9 | Other Problem Related to Employment |
| 995.83/T76.21XA | Adult Sexual Abuse by Nonspouse or Nonpartner, Suspected; Initial Encounter |
| 303.90/F10.20 | Alcohol Use Disorder, Severe, in sustained remission |
| 305.20/F12.10 | Cannabis Use Disorder, Mild (according to self-report in past ten months) |

(*Id.* at 52.)  The second section is entitled "Opinions," which consist of Green's criticisms of and comments about the findings and conclusions contained in Goranson's and Wicher's respective reports.  (*Id.* at 52-63.)

On October 28, 2015, plaintiffs served their "Supplemental Expert Witness Disclosure" for Dr. Ballard.  (ECF No. 193-10.)  Ballard's supplemental report is ten pages and, she states, "[t]he content of this report overlaps substantially with my report dated January 11, 2015."  (*Id.*

at 4.)  Ballard uses the next three pages of her report to list her qualifications, identify the additional information she reviewed since her previous report, describe her "methods and procedures," and provide a disclaimer:

> "I have not met or directly evaluated Dr. Fees in forming my opinions, which limits the scope of the conclusions that I draw; specifically, I do not offer any diagnostic conclusions or treatment recommendations regarding Dr. Fees in this report.  Offering such recommendations is outside the scope of this report, which is to discuss the current case in the context of relevant research literature.

(*Id.* at 4-7.)

The remainder of Ballard's reports contains her "Findings and Opinions."  The content of this five-page section contains each of the four findings contained in Ballard's initial January 11, 2015 report.  (*Id.* at 8-13.)  Ballard either reiterates, sometimes verbatim, or rephrases the content of her initial report.  Those passages which do not comment instead on aspects of the reports submitted by Dr. Goranson, Dr. Wicher, and Dr. Green.

Defendant filed its motion (ECF No. 191) for sanctions on November 5, 2015.

*Standard*

FED. R. CIV. P. 26(a)(2)(C)(ii) permits the admission of rebuttal expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified" by an initial expert witness.  *TC Sys. Inc. v. Town of Colonie, NY*, 213 F. Supp .2d 171, 179 (N.D.N.Y. 2002) (quoting rule).  "The function of rebuttal testimony is to explain, repel, counteract or disprove evidence of the adverse party."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 749, 759 (8th Cir. 2006) (citation omitted).  *Accord Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 636 (D. Haw. 2008) (a proper rebuttal expert report contradicts or rebuts the subject matter

of the affirmative expert report).  An expert rebuttal report must contain " 'facts supporting the opposite conclusion' of those at which the opposing party's experts arrived in their responsive reports." *Bone Care Int'l, LLC v. Pentech Pharm., Inc.*, No. 08-cv-1083, 2010 WL 3894444, at *15 (N.D. Ill. Sep. 30, 2010) (quoting *ABB Air Preheater, Inc. v. Regenerative Env. Equip., Inc.*, 167 F.R.D. 668, 673 (D.N.J. 1996).

Rebuttal evidence may be used to challenge the evidence or theory of an opponent, not to establish a case-in-chief.  *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991) ("Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief.").  A rebuttal report "is limited to 'new unforeseen facts brought out in the other side's case.'" *In re President Casinos, Inc.*, Bankruptcy No. 02-53005-659, 2007 WL 7232932, at * 2 (E.D. Mo. May 16, 2007) (quoting *Cates v. Sears, Roebuck & Co.*, 928 F.2d at 685).  A party may not hold back for use in its expert's rebuttal report testimony that responds to the opponent's expert's expected opinions and evidence:  " 'If the purpose of expert testimony is to 'contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one.' " *Amos v. Makita U.S.A.*, No. 2:09-cv-01304-GMN-RJJ, 2011 WL 43092 at *2 (D. Nev Jan. 6, 2011) (quoting *In re Apex Oil Co.*, 958 F.2d 243, 245 (8th Cir. 1992)).  *See also Morgan v. Commercial Union Assur. Cos.*, 606 F.2d 554, 556 (5th Cir. 1979) (same).  Nor is rebuttal testimony "an opportunity for the correction of any oversights in the plaintiff's case in chief," *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004), or for presenting new arguments, *1-800 Contacts, Inc. v. Lens.com, Inc.*,

755 F. Supp. 2d 1151, 1167 (D. Utah 2010). *Accord LaFlamme v. Safeway, Inc.*, No. 3:09-cv-00514-ECR-VPC, 2010 WL 3522378, at *2 (D. Nev. Sep. 2, 2010).

Under Rule 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." The Ninth Circuit has observed that a "party must submit its expert witness disclosures 'at the times and in the sequence that the court orders. . . . Rule 37(c)(1) gives teeth to th[is] requirement[ ]' by automatically excluding any evidence not properly disclosed under Rule 26(a)." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (citing Fed. R. Civ. P. 26(a)(2)©).   To overcome Rule 37's preclusive effect, a party must demonstrate that non-disclosure was either substantially justified or harmless.   *Galentine v. Holland America LineWestours, Inc.*, 333 F. Supp. 2d 991, 993 (W.D. Wash. 2004) (citing *Yeti by Molly, Ltd.*, 259 F.3d at 1106) (other citation omitted).   "The sanction is automatic and mandatory unless the sanctioned party can show that its violation . . . was either justified or harmless." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998).

*Discussion*

I.    The Foundation of Fees's Lawsuit.

Pace's alleged sexual assault and harassment, and the consequences to Fees's emotional state and veterinary business, are the foundation of Fees's lawsuit and have been from its inception.   The three iterations of plaintiffs' complaint are proof:   each version uses Pace's

conduct as the genesis of Fees's claims. The latter two versions contain multiple references to Pace by name and detailed descriptions of the alleged conduct he allegedly committed.

Fees's original complaint included a Title VII claim for sexual harassment based on the alleged conduct of at least two of defendants' "senior, married corporate executives," a cryptic reference which Fees's subsequent amendments solved with specific references to Pace. The First Amended Complaint contains detailed descriptions of Pace's alleged sexually harassing conduct, including the rape, and added a claim for intentional infliction of emotional distress based on the alleged sexual harassment and hostile work environment. Fees alleged Pace and the defendant "caused Dr. Fees severe mental and/or emotional distress from the highly foreseeable sexual harassment, causing emotional reactions including, shame, humiliation, embarrassment, anger and worry." Her prayer for this claim sought damages "for non-economic losses, including physical and emotional injury, pain and suffering, mental anguish, humiliation, embarrassment, and loss of enjoyment of life[.]" The Second Amended Complaint retained the references to Pace and the descriptions of his alleged conduct, and added claims for retaliation under Title VII and Oregon law, based on punitive actions against Fees's veterinary business and conduct that breached her charter agreement with defendant, allegedly because she reported the alleged rape and sexual harassment to the defendant.

Fees's many health care providers who treated or examined her for these injuries documented numerous examples and references regarding Pace's conduct as the cause of those injuries. Barsnack explicitly stated in her December 12, 2014 report that Fees was suffering emotional distress as a direct result of the workplace "trauma," rape, and harassment alleged in

the complaint.  Fees told Goranson during the June 8, 2015 IME "I was raped by my boss who continued to sexually harass me for years."  Fees made virtually identical statements to Wicher and Green to describe the reason for their respective examinations.  Fees's "emotional state" is the sole subject of Brunicardi's November 19, 2014 status report to Fees's attorneys.

Put simply, no person who read Fees's three complaints could misunderstand that Fees steadfastly believed Pace's conduct is the origin of her emotional injuries.

II.      Fees's Case-In-Chief.

To prove her case-in-chief on the claims that existed as of the January 12, 2015 initial expert disclosure deadline, Fees needed to prove she experienced emotional distress alleged in her complaint.  In Count III of her Second Amended Complaint Fees implicitly acknowledged her emotional distress is an element of her case-in-chief:

> 94.   To establish a hostile-environment sexual-harassment claim under Title VII, an employee must show:
>
> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

(Second Amended Complaint (ECF No. 64), at 30 (underline added).)  On this claim Fees sought "mental anguish damages."  (*Id*. at 32.)  In Count IV Fees also sought "mental anguish damages" for her Title VII retaliation claim (*id*. at 33), in Count V for her state-law sexual harassment claim (*id*. at 34), in Count VI her state-law retaliation claim (*id.* at 35), and in Count VII for her negligent supervision and retention claim (*id*. at 36).

Count VIII of the Second Amended Complaint contains Fees's intentional infliction of emotional distress claim, which clearly is rooted in Pace's conduct:

> 124.   CPI intended to inflict emotional distress on Dr. Fees by intentionally creating or permitting a hostile working environment where CPI's executives and supervisory employees sexually harassed and continue to harass Dr. Fees.
>
> 125.   CPI acted intentionally in engaging in the aforementioned conduct and knew and/or should have known its conduct <u>would cause severe mental and/or emotional distress</u>.
>
> 126.   CPI's conduct <u>caused Dr. Fees severe mental and/or emotional distress</u> from the highly foreseeable sexual harassment, causing emotional reactions including, shame, humiliation, embarrassment, anger and worry.
>
> 127.   CPI's offensive conduct continues to date.
>
> 128.   CPI and Dr. Fees were in a special relationship by virtue of the agreements described above.
>
> 129.   As a result of CPI's intentional actions, Dr. Fees has suffered non-economic damages in an amount to be determined at trial.

(*Id*. at 36 (underline added).)   Fees's prayer requests: "actual and compensatory damages for non-economic losses, including physical and emotional injury, pain and suffering, mental anguish, humiliation, embarrassment, and loss of enjoyment of life[.]"  (*Id*. at 37.)

There is no dispute Fees must prove as part of her case-in-chief the emotional harm she alleges, including the severe emotional harm that is a liability element of her IIED claim.  The gravamen of the tort of IIED is "*a loss due to intentionally inflicted severe emotional distress*." *Checkley v. Boyd*, 170 Or. App. 721, 732 (2000), quoting *Spiess v. Johnson*, 89 Or. App. 289, 294, 748 P.2d 1020, *aff'd by equally divided court* 307 Or. 242, 765 P.2d 811 (1988) (italics in original).  "It remains for plaintiff to come forward with satisfactory evidence that the conduct

occurred as she alleges, that the [defendant] had the requisite intent, <u>and that the conduct caused the damages she has alleged</u>." *Williams v. Tri-County Metro. Transp. Dist. of Oregon*, 153 Or. App. 686, 694 (1998) (underline added).

In short, there is no uncertainty that Fees's case-in-chief required her to prove the existence, nature, and extent of her emotional harm, and establish as its cause the conduct she alleged in her complaints.

III.    The Facts and Circumstances Known to Plaintiffs Prior to the January 12, 2015 Deadline for Plaintiffs' Initial Expert Disclosures, and What They Reasonably Should Have Anticipated.

The conditions and symptoms, and related treatments, pre-existing the November 2008 incident which Goranson and Wicher documented in their respective reports were not "new unforeseen facts brought out in the other side's case."  Both Goranson and Wicker noted that Fees's medical records establish that she experienced and suffered from mental and emotional issues that predated the November 2008 incident, included a prior rape and attempted rape by a co-worker in 2004; alcohol abuse; domestic conflict, which included at least one instance of physical violence; and one or two courses of mental health counseling; and mental health treatment.  .  The medical records clearly show Fees had undergone repeated mental health counseling and treatment beginning at least as early as 2004, and that those providers diagnosed conditions or identified elements of conditions which Fees's subsequent lawsuit allegations put into issue.  Both Grandson and Wicker documented and commented upon the significance to their respective diagnoses and assessments of Fees's alcohol abuse and marijuana use, and of the relevance to her allegations against Pace of her relationships with men both before and after the

November 2008 incident.  Fees's had knowledge of these facts, fact directly relevant to the allegations and damages that are the focus of her lawsuit.  The facts described and pre-existing conditions identified in Grandson's and Wicker's reports were not unexpected or unanticipated.

Furthermore, Fees and her attorneys knew or reasonably should have anticipated that defendant would learn of and develop these facts, and use them to refute Fees's allegations of damages and even liability.  The lawyers and the court discussed the possible existence and relevance of Fees's pre-existing mental and emotional condition to her damages claims during the October 23, 2014, telephone status conference.  (ECF No. 81, at 13-17.)  Thus, the defendant's discovery and use of Fees's prior history to attack her emotional injury claims was readily foreseeable and not unexpected.

IV.    The Content of Plaintiffs' Initial Expert Disclosures.

Fees's allegations regarding Pace's conduct and the emotional damages it caused indisputably required Fees to prove the emotional damages she alleged resulted from Pace's conduct.  Plaintiffs' initial expert disclosures described the testimony of two of Fees's treating providers, Barsnack and Brunicardi, to support those allegations, but neither provider could supply the testimony plaintiffs described in their initial disclosures.  Brunicardi, expressly declared himself not qualified to render opinions in any of the areas for which plaintiffs had offered him as an expert.  Barsnack revealed she had not been asked to serve as an expert and further stated she felt "uncomfortable" being asked to do so.

Fees's disclosure for her only retained initial expert, Ballard, revealed Ballard possessed some professional expertise in trauma conditions, but Ballard never addressed Fees's trauma in

her report.    Instead, Ballard opined on general principles of power differentials and common

victim behavior to provide context for Fee's actions after reporting the November 2008 incident.

She made no attempt to engage in the examination, assessment, and diagnoses of Fees and her

mental health conditions.

In summary, plaintiffs' initial expert witness disclosures did not identify any expert

qualified or willing to support Fees's emotional distress claims, tasked with the role of providing

that evidence, or otherwise serving as the "trauma specialist" Fees and her attorneys knew they

would need to support of Fees's emotional distress claims and damages.    Fees's case-in-chief on

this issue, therefore, remained unsupported after plaintiffs submitted their initial expert

disclosures.

V.    The Content of Defendant's Expert Disclosures.

Goranson and Wicher did the thorough examination of Fees and the methodical

assessment of her mental health condition and emotional injuries that plaintiffs' initial experts

should have undertaken.    Both Goranson and Wicher took a careful history from Fees and gave

particular attention to her narrative about Pace and his conduct.    The focus Goranson and Wicher

placed on Pace stemmed from Fees's description of her emotional injuries.    Fees told Goranson:

> I asked Dr. Fees to tell me what this examination was about.    She told me she was
> not supposed to discuss the lawsuit.    She told me it was confidential, but that it
> was about sexual harassment, breach of contract, and retaliation.    When I asked
> her more specifically, she said "I was raped by my boss who continued to
> sexually harass me for years.    I reported it a couple of weeks after the event to
> Bruce Berning, an attorney for Banfield."    She told me that nothing had been
> done about what she reported.

(ECF No. 193-8, at 5.)    Fees provided a similar description to Wicher:

**PRESENT INJURY**

The information in this section is based upon Dr. Fees' self-report.

Dr. Fees claims that she was raped and sexually harassed by her regional vice-president, Aundre Pace, starting with the alleged rape, which she states occurred on November 2, 2008."

(ECF No. 193-8, at 46.)  Fees's statements to Goranson and Wicher paralleled the allegations contained in each of Fees's three complaints which, as discussed above, all were founded on Pace's conduct.

The source of Fees's emotional injuries was obvious from the descriptions she gave to Goranson and Wicher, and from allegations in Fees's complaints:  Pace's conduct and defendant's alleged failure to respond to her report of the alleged rape.  The examinations Goranson and Wicher conducted uncovered no facts about Pace that had not existed well before Fees filed her lawsuit.  During their respective examinations Goranson and Wicher each discovered events and pre-existing conditions which provided equally plausible sources of the emotional injuries Fees attributes to Pace's and defendant's conduct.  These facts were equally available to plaintiffs' initial experts.

VI.     The Content of Green's Rebuttal Report.

Green's rebuttal report is notable for the amount of space – 50 of its 60 pages – used to describe information and offer impressions that do not rebut Goranson's and Wicher's reports, but instead build the supporting foundation for Fees's emotional injury claims.  Green concentrates on Pace's responsibility for causing Fees's current conditions and emotional harm; as the court previously noted, Green discusses at length or refers to Pace throughout his report.

(*See* ECF No. 192-9, at 19-21; 22; 24; 25-29; 32; 33; 34; 37; 38 (attributing Fees's "exhaustion to 'rehashing the content of the rape' "); 47-48; 49-50; 51; 56-58; 59; 60.)  Green devotes extensive space to Pace's conduct before, during, and after the November 2008 incident, and to its effect on Fees.  Representative is the section entitled "Alleged sexual assault by Mr. Aundre Pace," in which Green offers a comparative summary of Fees's and Pace's respective "narratives" about the November 2008 incident.  (ECF No. 192-9, at 18-20.)

The information documented in the first 50 pages of Green's rebuttal report always has been available to plaintiffs to support their case-in-chief.  Green's chronicle of every aspect and event of Fees's personal and professional life presents information that could have obtained long before plaintiffs' January 12, 2015 initial expert disclosures deadline, had plaintiffs arranged to have Fees examined to confirm her allegations of emotional harm and its cause.  Each of the five standard diagnostic tests Green administered to Fees and discusses in his report could have been administered to Fees well before the January 12, 2015 deadline.  Under the heading "Summary of information reviewed in this rebuttal evaluation," Green states "to a reasonable degree of psychological probability" numerous bullet-point conclusions that merely recast long-available information about Fees's personal, family, social, and relationship histories, and the events leading up to, during, and following the November 2008 incident.  (ECF No. 192-9, at 45-52.)

Moreover, Green's resume makes clear he is the "trauma specialist" Fees and her attorneys knew they needed to give evidence in support of her emotional damages case-in-chief.  One of Green's practice focuses is the occurrence and effect of trauma arising from a variety of

causes and in a variety of settings.  Green brings this focus to bear in evaluating every facet of Fees's presenting complaints and symptoms.

In short, fully 80 per cent of Green's rebuttal report is not a rebuttal at all but a thorough treatment of Fees's damages case-in-chief.  Green examined Fees in-depth and described causal connections between Pace's conduct and the emotional injuries Fees alleges, connections Fees has consistently attributed to Pace before and after she filed her lawsuit.  Green supports his conclusions with evidence gained from the information available from Fees, her family members, Fees's treatment records, and his own diagnostic tests, all of which either existed or were obtainable before the January 12, 2015 deadline for plaintiffs' initial expert disclosures. He assesses Fees's trauma, an assessment Fees and her attorneys knew they would obtain before the January 12, 2015 deadline for their initial expert disclosures.  Viewed objectively, the first 50 pages of Green's September 28, 2015 rebuttal report is in reality an initial expert report which plaintiffs should have submitted on January 12, 2015.

Not until the "Opinions" section at page 49 of his report does Green respond to the opinions contained in Goranson's and Wicher's respective reports.   Green's first opinion exemplifies the advantage he and plaintiffs obtained by submitting his report as a "rebuttal" report:  "A.  Dr. Goranson's Primary Diagnosis Is Not Based Upon the DSM-5 And Is Not Accurate Based Upon the Current Standards."  The dozen or so other opinions that follow similarly flow from the observations, opinions, and conclusions Goranson and Wicher each made.  Their respective reports served as a template for Green's report, an advantage Green used

to tailor his own examination of Fees, avoid missteps in forming his own opinions, and fashion precise criticisms of the opinions and conclusions contained in both reports.

Green's report is an initial report, not a rebuttal report.  This court reached the same conclusion regarding a rebuttal report submitted in *Century Indemnity Co. v. Marine Group, LLC, et al.*, Case No. 3:08-cv-1375-AC, 2015 WL 5521986 (D. Or. Sept. 16, 2015).  This court summarized the moving parties' argument for excluding the purported rebuttal report:

> Third-Party Plaintiffs argue Robertson's report actually contains St. Paul's case-in-chief on the critical lost-policy issue and, thus, Robertson is not a proper rebuttal witness.  They assert St. Paul's "apparent strategy was to withhold its expert reports until the rebuttal stage so as to flush out [Third-Party Plaintiffs'] arguments and to deprive [Third-Party Plaintiffs] of an equal rebuttal opportunity."  They argue this tactic allowed St. Paul to "tailor" its expert testimony and deprived their expert of the opportunity to rebut St. Paul's lost-policy theories, Third-Party Plaintiffs ask the court to strike the Robertson report.

*Id.*, at *1.

Here, defendant makes the same argument, and correctly so.  Fees's damages claims turn on the emotional injuries she alleges Pace's and defendant's conduct inflicted upon her, and it is her burden to prove those damages.  Virtually the entirety of Green's report addresses Fees's damages case-in-chief and offers opinions that support her emotional injury claims.  The content and organization of Green's report clearly are tailored to undermine and discredit the opinions and conclusions Goranson and Wicher each reached, an approach Green could not have employed had he properly submitted his report as an initial expert report.  Rebuttal evidence may not be used to establish a case-in-chief, *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991), but that is precisely the purpose and function of Green's rebuttal report.

VII.    Plaintiffs' Non-Compliance With The Court's Orders.

The court set a December 16, 2014 deadline for plaintiffs' initial expert disclosures during a telephone status conference at which four of plaintiffs' attorneys were in attendance and one of those attorneys explicitly agreed to the deadline.  Three days later the court entered a minute order memorializing that deadline.  When plaintiffs missed the deadline, they explained they were under a "mistaken assumption" and "should not be penalized for an honest error" – an explanation controverted by the irrefutable record but also, as the court then noted, consistent with plaintiffs' disregard of at least two of this court's previous orders.  Independent of that fact, plaintiffs failed to comply with the court's expert discovery scheduling order, a scheduling order of considerable importance in this case because expert medical evidence is critical to Fees's entire damages case and defendant's defense of those claims.  Thus, the orderly and timely progression of the parties' staggered submissions of expert reports held particular importance.

Plaintiffs missed their expert disclosure and failed to demonstrate good cause for doing so, but the court set a new deadline, and it deferred imposing sanctions even though Rule 16(f)(1)(C) empowered it to do so.  The court conditioned its sanctions deferral on plaintiffs' compliance with the court's new January 12, 2015 initial expert disclosure deadline, as well as with the remaining expert disclosure deadlines.  The court explicitly stated it would impose preclusive sanctions if plaintiffs failed to meet the new date for disclosure of their initial experts.

First, then, plaintiffs failed to meet the January 12, 2015 deadline because they did not submit Green's report by that date, and Greens' report is stricken for that reason.  The court has found Green's rebuttal report to be an initial report, which plaintiffs did not submit on the date

Page 43 - ORDER AND OPINION

for their initial expert disclosures.  Instead, plaintiffs submitted Green's report on September 28, 2015, more than nine months after the January 12, 2015 deadline.  Thus, the report is untimely under the court's scheduling order, and Green's report is excluded for this reason.

Second, the court excludes Green's report as a sanction for violating the original December 16, 2015 deadline for plaintiffs' disclosure of initial experts.  The court deferred imposing sanctions for plaintiffs' original non-compliance on condition that plaintiffs complied with the court's new scheduling deadlines for expert discovery:  "Failure to comply with the January 12, 2015 deadline would result in sanctions, including exclusion of expert evidence and testimony."  (ECF 86.)  Plaintiffs failed to comply with the deadline when they submitted Green's initial report as a rebuttal report.  Green's report is excluded for this additional and separate reason.

Third, Green's rebuttal report is an inappropriate attempt to repair deficiencies in Fees's case-in-chief.  A rebuttal report "is not an opportunity for the correction of any oversights in the plaintiff's case in chief."  *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004).  Here, plaintiffs did precisely that.  In their May 2015 deposition testimony Barsnack and Brunicardi, each designated in plaintiffs' January 12, 2015 initial expert disclosures as a treating provider who would offer testimony to support Fees's emotional injury claims and their connection to Pace's and CPI's conduct, each rejected their designations as and qualifications to be expert witnesses.  Barsnack's and Brunicardi's respective testimony left a gap in Fees's case-in-chief: despite plaintiffs' representation that two of her treating providers would give opinions linking her PTSD, other conditions, and her emotional distress to the conduct of Pace and CPI, neither

provider could do so.  Plaintiffs retained Green to fill that gap.  Two months later on August 30 and 31, 2015, he examined Fees; his report, as the court has noted previously, reflects the examination, evaluation, diagnosis, and opinions plaintiffs should have offered at the outset to support Fees's emotional injury claims.  Notably, Green appears to be the "trauma specialist" Fees and her attorneys acknowledged to Barsnack in December 2014 they needed to support Fees's claims; plaintiffs, however, retained him many months too late and only after they learned the experts they had designated could not give the evidence plaintiffs assumed.  Plaintiffs attempted to fill the evidentiary deficiency in Fees's case-in-chief with Green's report, which they may not do.  Accordingly, Green's report is excluded for this additional and separate reason.

Fourth and finally, to the extent any opinion or conclusion contained in Green's report might be considered rebuttal opinion, the court excludes it as part of the sanction imposed.  The court explicitly warned plaintiffs it would impose preclusive sanctions if plaintiffs failed to comply with the reset deadline for their initial expert disclosures.  Plaintiffs failed to comply – a failure the record demonstrates resulted either from plaintiffs' failure to investigate Barsnack's and Brunicardi's ability to give the testimony plaintiffs described, or from their calculated decision to produce a case-in-chief expert as a rebuttal expert.  Additionally, by that decision plaintiffs gained an advantage they would not have enjoyed and prejudiced defendant's expert evidence.  Thus, exclusion of any otherwise proper rebuttal information is warranted, and Green's report is excluded for this additional and separate reason.

VIII.   Ballard's Supplemental Report.

One final issue must be addressed.  On October 28, 2015, plaintiffs submitted Dr. Ballard's supplemental expert report, a report which mostly reiterates her initial report (*see* ECF No. 193-10, at 4 ("The content of this report overlaps substantially with my report dated January 11, 2015.")), but which adds opinions that are based on Green's report and its contents.  (ECF No. 193-10, at 5 (listing under "Database" as "Additional Information Reviewed for October 27, 2015 Report" the "Plaintiff's [sic] Designation of Rebuttal Expert, dated September 28, 2015, including Exhibit A:  Forensic Psychological Examination Offered in Rebuttal to Defendant's Expert Witness Disclosures, by Randall L. Green, Ph.D.").)  To the extent that her supplemental opinions are based on Green's report, Ballard's supplemental opinions are excluded.

*Conclusion*

Defendant's motion (ECF No. 191) for sanctions is GRANTED.  The report of Dr. Randall Green is STRICKEN and is EXCLUDED from evidence in this case.  FURTHER ORDERED that the content of Green's report may not be used or referred to for any purpose in this case, including at trial, by any party.  FURTHER ORDERED that Green is PRECLUDED from giving any testimony or evidence, including as a witness at trial.

The supplemental report of Dr. Roberta Ballard is STRICKEN and is EXCLUDED from evidence in this case to the extent that her supplemental opinions are based on Green's report. FURTHER ORDERED that such content of Ballard's supplemental report that is based on or refers to Green's report may not be used or referred to for any purpose in this case, including at

trial, by any party.    FURTHER ORDERED that Ballard is PRECLUDED from giving any

testimony or evidence about that content, including as a witness at trial.

IT IS SO ORDERED.

DATED this ____19th____ day of April, 2016.

_____/s/ JohnV. Acosta____
JOHN V. ACOSTA
United States Magistrate Judge